*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2017 UT 58**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

GENOVEVA RUEDA,
*Appellee,*

*v.*

UTAH LABOR COMMISSION, JBS USA LLC, AMERICAN ZURICH
INSURANCE CO., and ZURICH AMERICAN INSURANCE CO.,
*Appellants.*

No. 20140043
August 31, 2017

On Certification from the Utah Court of Appeals

Attorneys:

Loren M. Lambert, Midvale, for appellee

Jaceson R. Maughan, Salt Lake City, for appellant
Utah Labor Commission

Mark R. Sumsion, Cody G. Kesler, Salt Lake City,
for appellants JBS USA LLC, American Zurich Insurance Co.,
and Zurich American Insurance Co.

JUSTICE HIMONAS authored an opinion, in which
JUSTICE PEARCE joined.

CHIEF JUSTICE DURRANT authored an opinion, in which
JUSTICE DURHAM joined.

ASSOCIATE CHIEF JUSTICE LEE authored an opinion.[*]

JUSTICE HIMONAS, opinion:

---

[*] Because no Justice holds a majority, the ruling of the lower
tribunal stands.

**INTRODUCTION**

¶ 1    We confront the effect of the 1991 amendments to the Occupational Disease Act, Utah Code § 34A-3-101 to -113, on the Workers' Compensation Act, *id.* § 34A-2-101 to -905. Lamentably, we are divided on how to square the acts and are left with a splintered opinion in which Justice Pearce and I would affirm in part and reverse in part the final order of the Labor Commission, Chief Justice Durrant and Justice Durham would affirm, and Associate Chief Justice Lee would vacate and remand. The result is that the order stands as issued.[1]

¶ 2    The facts in this case concern Genoveva Rueda, who claimed workers' compensation benefits against her employer, JBS USA, for injuries she sustained while working in its meat processing plant from 2007 to 2009. Initially, JBS USA and its insurers, American Zurich Insurance and Zurich American Insurance, (collectively, JBS) paid Ms. Rueda's benefits. But in 2012 they asked for a medical review to determine any further liability. After this review, JBS determined that either it was no longer liable to Ms. Rueda or "Ms. Rueda's condition, while connected to the employment, did not constitute a compensable 'accident' under the Workers' Compensation Act, but was instead an occupational disease under the . . . Occupational Disease Act." Ms. Rueda petitioned an administrative law judge (ALJ) on the matter. The ALJ found in favor of Ms. Rueda, concluding that JBS was subject to ongoing liability for her injuries, which were caused by a workplace accident under a theory of "cumulative trauma." JBS petitioned for review of this decision to the Labor Commission, which upheld the decision of the ALJ in its final order. That order is before us on proper appeal by JBS.

¶ 3    With an eye trained on our longstanding precedent, I would affirm in part and reverse in part. The majority of my colleagues, however, based on no relevant changes to the Workers' Compensation Act and only minor, twenty-six-year-old amendments to the Occupational Disease Act, would now fundamentally adjust the scope of both acts. While I certainly

---

[1] What is unmistakable given the fragmented nature of this decision is that legislative attention to this issue would be of real benefit. On this there is unanimity.

understand their urge to bring clarity to these muddy waters, and while I also share many of their policy concerns, I think we forget the wisdom behind Justice Scalia's aphorism that legislative bodies do not "hide elephants in mouseholes" and, in so forgetting, overstep our authority by making sweeping changes. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

¶ 4    I reject this approach and tackle the questions presented by this matter as set forth below. First, I address JBS's contention that the 1991 amendments to the Occupational Disease Act abrogated the "cumulative trauma" theory of injury by accident under the Workers' Compensation Act. I conclude that they did not.[2]

¶ 5    Second, I address the challenge by Ms. Rueda that her injury was improperly classified as the result of "cumulative trauma" rather than a series of distinct accidents. I conclude that there was substantial evidence to support the Labor Commission's findings that Ms. Rueda suffered a medical condition affecting her right arm as the result of gradual and consistent exposure to the regular duties of her employment. And, thus, I would affirm the finding of the Labor Commission that Ms. Rueda's injury was caused by "cumulative trauma."

¶ 6    Third, I conclude that these findings, when viewed against the legal backdrop of the proper construction of the interplay between the Occupational Disease Act and the Workers' Compensation Act, result in a determination that Ms. Rueda's condition is an occupational disease. Thus, in my view, we should reverse the Labor Commission's determination that Ms. Rueda's injury was by accident.

### BACKGROUND

¶ 7    Ms. Rueda began working at JBS USA's meat processing plant on July 23, 2007. She first worked as a mock tender trimmer in the fabrication department, which required her to repeatedly remove meat from a conveyor belt with a hook and trim the meat with a knife. Then, for a short time, Ms. Rueda worked in the "hot boning area," where she used a knife to "poke into the head of the

---

[2] Each of the opinions reaches this same conclusion, albeit for differing reasons.

tender" and "clip[ped] the tender to drop out of position." She also spent several weeks working as a fat trimmer, "trimming fat and lean with a straight knife."

¶ 8    As early as August 2007, Ms. Rueda began to experience "right upper extremity . . . symptoms, including numbness, pain, wrist discomfort, elbow pain, forearm discomfort, and right shoulder symptoms." She also experienced swelling in her right hand. The swelling in her hand gradually worsened over time and spread up her right arm; the other pains and symptoms likewise persisted and progressed throughout her employment at the plant.

¶ 9    On January 1, 2008, Ms. Rueda was trimming mock tender and pulled product with a hook in order to trim it when she "felt pain on the left sides of her neck, shoulder and low back." Afterward, she was diagnosed with neck, shoulder, and back strain and began physical therapy in February 2008. On April 28 and June 3, 2008, Ms. Rueda "reported right medial elbow soreness and right shoulder and arm pain." She continued receiving physical therapy until late November 2008.

¶ 10  In February 2009, Ms. Rueda was moved to a new position as a meat trimmer. She would use her left hand to position the neck bone and use her right hand to remove the meat from the bone with a mechanized knife. The physical demands of the position were "in the [l]ight work category with frequent lifting up to 20 pounds and carrying objects up to 10 pounds, reaching with the right [arm] occasionally and the left arm frequently, handling with the right hand frequently and the left hand frequently[,] and standing six to eight hours."

¶ 11  On May 11, 2009, Ms. Rueda filed another injury report. On that day, she felt pain in her right shoulder and in her right hand as she was removing meat from bones and throwing the bones onto trays. She "began to hear [her] right shoulder make a popping noise that she had not heard before." Ms. Rueda reported the injury and was placed on light work duty, which consisted of using a small hand tool to count pieces of product as they fell into a box.

¶ 12  In June and July 2009, Ms. Rueda received physical therapy for her ailments. An MRI scan revealed a "partial thickness tear through the supraspinatus and infraspinatus

portions of the rotator cuff." Ms. Rueda underwent surgery on her right shoulder in October 2009 and returned to work the next month. She was assigned to light work duty but was released from work a week later "due to ongoing right arm pain" and did not return to work after that.

¶ 13   On January 11, 2010, a doctor opined that Ms. Rueda's right shoulder condition was "medically stable." He assessed "a permanent impairment rating of 4% whole person for [Ms. Rueda's] right shoulder condition of which he apportioned 80% to the industrial accident, or 3% whole person, and 20% to non-industrial." The following day, January 12, 2010, Ms. Rueda voluntarily quit her job.

¶ 14   After leaving JBS USA, Ms. Rueda continued undergoing medical evaluations and treatment for her right upper extremity symptoms for a couple of years. In 2012, JBS requested an orthopedic evaluation to determine its additional liability, if any, for Ms. Rueda's condition. After the evaluation, JBS maintained that it was no longer liable for Ms. Rueda's medical expenses and that it had paid Ms. Rueda all that was required under the law. Alternatively, JBS contended that Ms. Rueda's injury was the result of an occupational disease, rather than an industrial accident, and that any benefits should be apportioned in accordance with the medical evidence. Ms. Rueda then filed an Application for Hearing with the Adjudication Division of the Utah Labor Commission, claiming entitlement to additional workers' compensation benefits.

¶ 15   The dispute was heard before an ALJ, who determined that there was a conflict of medical opinion regarding Ms. Rueda's need for ongoing treatment. The ALJ directed the factual medical questions to a Labor Commission medical panel, which issued a report on May 16, 2013. Neither party objected to the medical panel's report, and it was admitted into evidence. Based on the earlier hearing and the medical panel's report, the ALJ ruled in favor of Ms. Rueda, concluding that Ms. Rueda needed further treatment for her condition resulting from her "industrial accident," and ordered JBS to provide Ms. Rueda additional workers' compensation benefits.

¶ 16  In response to the ALJ's order, JBS asked the Labor Commission for review. The Labor Commission affirmed the

ALJ's order, and JBS subsequently filed a petition to review the Labor Commission's decision with the Utah Court of Appeals under the Utah Administrative Procedures Act. UTAH CODE § 63G-4-403. The court of appeals certified the case for transfer to this court. We have jurisdiction under Utah Code section 78A-3-102(3)(b).

## STANDARDS OF REVIEW

¶ 17 Appellate courts have authority to review final agency adjudications on the grounds enumerated in the Utah Administrative Procedures Act. UTAH CODE § 63G-4-403. A court may grant relief if "it determines that a person seeking judicial review has been substantially prejudiced" because "the agency has erroneously interpreted or applied the law" or "the agency action is based upon a determination of fact, made or implied by the agency, that is not supported by substantial evidence when viewed in light of the whole record before the court." *Id.* § 63G-4-403(4)(d), (g).

¶ 18 The first issue in this case is the Labor Commission's interpretation of the scope of coverage under the Workers' Compensation Act and the Occupational Disease Act. Subsection (4)(d) of Utah Code section 63G-4-403 does not imply a standard of review, and we therefore turn to our traditional method for determining the proper standard by reviewing our case law. *Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 21, 308 P.3d 461. The Labor Commission's "interpretation of a statute is a question of law, which we review for correctness." *Miller v. Utah Dep't of Transp.*, 2012 UT 54, ¶ 23, 285 P.3d 1208 (citation omitted). Thus, we review the Labor Commission's interpretation of the Occupational Disease Act and the Workers' Compensation Act for correctness.

¶ 19 The second issue is whether Ms. Rueda's injury was the result of "cumulative trauma," as the Labor Commission found, rather than the result of a series of distinct accidents. The grounds in section 63G-4-403 "do[] not expressly mandate the standards of review [courts] must employ when reviewing [agency] actions." *Murray*, 2013 UT 38, ¶ 18. However, we have recognized that subsection (4)(g) implies a standard of review, permitting the court to grant relief "only after reviewing the agency's determination of fact for a lack of substantial evidence." *Id.* ¶ 19.

Therefore, we review the agency's findings of fact on whether Ms. Rueda's injury was the result of "cumulative trauma" for substantial evidence.

¶ 20 Finally, JBS contends that the Labor Commission misapplied the Workers' Compensation Act to the facts of Ms. Rueda's case. This claim also falls under section 63G-4-403(4)(d), and we once again turn to our traditional method for determining the proper standard of review by reviewing our case law. *Id.* ¶ 21. Since JBS's claim "involv[es] application of a legal standard to a set of facts unique to a particular case," it is a mixed question of law and fact. *In re Adoption of Baby B.*, 2012 UT 35, ¶ 42, 308 P.3d 382. In such situations, our standard of review is "sometimes deferential and sometimes not." *Id.* Whether we grant deference to the administrative body's findings depends on

> (1) the degree of variety and complexity in the facts to which the legal rule is to be applied; (2) the degree to which a trial court's application of the legal rule relies on "facts" observed by the trial judge, such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts; and (3) other policy reasons that weigh for or against granting [deference] to trial courts.

*Murray*, 2013 UT 38, ¶ 36 (alteration in original) (citation omitted).

¶ 21 Here, we determine that the Labor Commission's decision to classify Ms. Rueda's injury as a compensable injury by accident under the Workers' Compensation Act is entitled to non-deferential review. The Labor Commission's determination that Ms. Rueda's facts satisfy the legal requirements of injury by accident under the Workers' Compensation Act turns on the legal effect of the established facts regarding the circumstances surrounding her injury. Therefore, "the ultimate question is the legal effect of the facts rather than witness credibility or demeanor." *Id.* ¶ 40. Thus "we are in a better position to analyze [this question] than the [Labor] Commission." *Id.*

### ANALYSIS

¶ 22 First, JBS argues that the 1991 amendments to the Occupational Disease Act should be read to have expanded its

application. Furthermore, JBS argues that this expansion comes at the expense of the Workers' Compensation Act, by abrogating the "cumulative trauma" theory of injury by accident developed by the courts under the Workers' Compensation Act. I decline the invitation to completely abandon the "cumulative trauma" theory of injury by accident, and clarify the effect of the 1991 Occupational Disease Act amendments on workers' compensation in Utah.

¶ 23 Second, I reject Ms. Rueda's contention that the Labor Commission made an erroneous factual finding when it found that Ms. Rueda's injury was caused by "cumulative trauma" and not by separate, distinct accidents.

¶ 24 Finally, I agree with JBS that the Labor Commission misapplied the Workers' Compensation Act to Ms. Rueda's case. I would hold that Ms. Rueda's injury is an occupational disease under the Occupational Disease Act. Therefore, I would reverse the Labor Commission on this point and remand for further proceedings consistent with this opinion.

## I. CLASSIFICATION OF WORKPLACE HARM UNDER EITHER THE WORKERS' COMPENSATION ACT OR THE OCCUPATIONAL DISEASE ACT

¶ 25 JBS contends that this case is an opportunity for the court to create a more "common sense" demarcation between injuries by accident and occupational diseases by holding that proof of "cumulative trauma" can only establish an occupational disease. Ms. Rueda counters that there is no reason to upset the status quo between the two. I opt for a middle path. While I decline to abolish the "cumulative trauma" theory of injury by accident, I would clarify the state of the law surrounding occupational diseases and injuries by accident.

¶ 26 Utah's workers' compensation scheme is outlined by two separate but related chapters of the Utah Labor Code: the Occupational Disease Act and the Workers' Compensation Act.

¶ 27 Prior to the enactment of the Occupational Disease Act in 1941, workers who developed an occupational disease had to seek recovery under a theory of negligence by their employer because the Workers' Compensation Act did not cover occupational diseases. *See Masich v. U.S. Smelting, Ref. & Mining Co.*, 191 P.2d 612, 615 (Utah 1948); *see also Young v. Salt Lake City,*

90 P.2d 174, 176–77 (Utah 1939). The passage of the Occupational Disease Act brought occupational diseases into the realm of the workers' compensation system. *See Masich*, 191 P.2d at 615. Much of the wording of the Occupational Disease Act was taken from the Workers' Compensation Act, and this court noted that "the Occupational Disease Act . . . is closely allied to the Work[ers'] Compensation Act." *Id.*

¶ 28 However, the original Occupational Disease Act had limited application in the scheme of workers' compensation because it provided a remedy for only twenty-seven specifically enumerated diseases arising out of a worker's employment. UTAH CODE § 42-1a-28 (1943). Most of these enumerated diseases consisted of poisoning caused by various compounds. *Id.* § 42-1a-28(3)–(21). The enumerated diseases also included conditions like "[s]ynovitis, or tenosynovitis, or bursitis, or cellulitis, of the wrist, elbow, knee, or hand, due to continual pressure or friction or to repeated trauma or vibration of tools." *Id.* § 42-1a-28(25).

¶ 29 The Utah Legislature amended the Occupational Disease Act in 1949 to include a provision expanding the Act's coverage. *See* UTAH CODE § 35-2-27(28) (1953). In addition to providing coverage for the twenty-seven enumerated diseases, the Occupational Disease Act also covered other diseases and injuries that met six factors. *Id.*[3] These factors required that the disease or

---

[3] The six factors are

> (1) a direct causal connection between the conditions under which the work is performed and the disease or injury to health; (2) the disease or injury to health can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the employment; (3) the disease or injury to health can be fairly traced to the employment as to the proximate cause; (4) the disease or injury to health is not of a character to which the employee may have had substantial exposure outside of the employment; (5) the disease or injury to health is incidental to the character of the business and not independent of the relation of the employer and employee; and (6) the disease or injury to health

(cont.)

injury be related to and caused by employment, as opposed to a disease that was incident to ordinary life. *Id.*

¶ 30  In 1991, the legislature again amended the Occupational Disease Act. Now, the Occupational Disease Act provides remedies for "*any* disease or illness that arises out of and in the course of employment and is medically caused or aggravated by that employment." UTAH CODE § 34A-3-103 (emphasis added).[4]

¶ 31 On the other end of the workers' compensation spectrum lies the Workers' Compensation Act. The Workers' Compensation Act, originally passed in 1917, compensates workers for accidental injuries and excluded "disease[s] except as [they] shall result from the injury." COMPILED LAWS OF UTAH § 49-3112(5) (1917). The Workers' Compensation Act governs compensation for injuries caused "by accident arising out of and in the course of the employee's employment." UTAH CODE § 34A-2-401(1). The statute does not define "accident."[5]

¶ 32  Cognizant of the need to distinguish injuries by accident from occupational diseases and because this distinction is at issue in this case, I proceed to provide guidance for determining whether an injury is by accident under the Workers' Compensation Act or an occupational disease under the Occupational Disease Act.

---

must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence, though it need not have been foreseen or expected before discovery.

UTAH CODE § 35-2-27(28) (1953).

[4] The statute was also amended in 1997, but since only minor stylistic and renumbering changes were made, the statute remains substantively the same as after the 1991 amendments.

[5] This portion of the Workers' Compensation Act remains largely unchanged since its original iteration in 1917. *Compare* COMPILED LAWS OF UTAH §§ 49-3112(5), 49-3113 (1917), *with* UTAH CODE §§ 34A-2-102(1)(j), 34A-2-401(1).

¶ 33 "When interpreting statutes, our primary goal is to evince the true intent and purpose of the Legislature. We discern legislative intent and purpose by first looking to the best evidence of its meaning, which is the plain language of the statute itself." *State v. Martinez*, 2002 UT 80, ¶ 8, 52 P.3d 1276 (citation omitted) (internal quotation marks omitted). However, "[t]he legislature is entitled to invoke specialized legal terms that carry an extra-ordinary meaning. And when it does so we credit the legal term of art, not the common understanding of the words." *State v. Canton*, 2013 UT 44, ¶ 28, 308 P.3d 517.

¶ 34 In the present case, I cannot evince the legislature's "true intent and purpose" for injury classification from the ordinary meaning of "injury by accident" or "occupational disease." These terms are legal terms of art, deeply embedded in more than a century of precedent, which have taken on a specialized meaning in the context of workers' compensation schemes.[6] Therefore, to

---

[6] *See Purity Biscuit Co. v. Indus. Comm'n*, 201 P.2d 961, 968 (Utah 1949) (concluding that the Utah Legislature "intended to adopt the construction given to" the words "injury by accident" by *Fenton v. Thorley & Co.*, [1903] A.C. 433 (HL)); *see also Babahmetovic v. Scan Design Fla. Inc.*, 176 So. 3d 1006, 1008 (Fla. Dist. Ct. App. 2015) ("[I]t requires the presence of certain elements described . . . by terms of art such as accident, injury, arising out of work performed in the course and the scope of employment." (emphasis omitted)); *Aluminum v. Carkuff*, No. 2009-SC-000068-WC, 2009 WL 3526558, at *2 (Ky. Oct. 29, 2009) ("'Accident' and 'injury' are legal terms of art . . . ."); *O'Regan v. Preferred Enters., Inc.*, 758 So. 2d 124, 131 (La. 2000) ("We have highlighted the words, 'accident arising out of and in the course of his employment' because they are terms of art in the context of the Workers' Compensation Act."), *superseded on other grounds by* LA. REV. STAT. § 1031.1 (2010); *Hoard v. ARA Servs., Inc.*, No. 179213, 1996 WL 33358106, at *3 (Mich. Ct. App. Sept. 20, 1996) ("'[O]ccupational disease[]' [is] a worker's compensation term of art."); *Vespers v. Springs Mills, Inc.*, 275 S.E.2d 882, 884 (S.C. 1981) ("The term 'contracted' is a term of art which has been defined for compensation purposes in occupational disease cases . . . ."). Indeed, "occupational disease" has taken on a meaning so distinct from its constituent parts that dictionaries define it as a collective

(cont.)

properly understand the meanings of "injury by accident" and "occupational disease," I believe we must undertake "a distinctive analysis and tracking of pertinent precedents." *Johannesen v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 638 N.E.2d 981, 984 (N.Y. 1994). To this end, I examine the legal history of the phrases "accident," "injury by accident," and "occupational disease," as well as accompanying case law, to derive the meanings of the legal terms of art at issue in this case.

¶ 35   In Utah, as well as the majority of other jurisdictions, the unexpectedness of the accident and the definiteness of the timing of the injury's occurrence have been the most important points of distinction in determining whether an injury resulted from an accident or was an occupational disease. *See* 3 Arthur Larson et al., Larson's Workers' Compensation Law § 42.02 (2017). The term "by accident" as used in the Utah Workers' Compensation Act was first discussed in *Tintic Milling Co. v. Industrial Commission,* 206 P. 278 (Utah 1922). After *Tintic*, Utah courts developed two lines of cases that defined "accident" differently: one required proof of an unusual event; the other, represented by *Carling v. Industrial Commission*, 399 P.2d 202 (Utah 1965), did not require such proof. *See Allen v. Indus. Comm'n,* 729 P.2d 15, 21–22 (Utah 1986). In *Allen*, this court renounced the unusual-event line of cases, which had confused the definition of accident, and reaffirmed the broad definition of accident espoused in *Carling. Id.*[7]

---

term. *See Occupational Disease*, Black's Law Dictionary (10th ed. 2010) ("A disease that is contracted as a result of exposure to debilitating conditions or substances in the course of employment."); *Illness*, Webster's Third New International Dictionary (2002) ("[A]n unhealthy condition of the body or mind"); *Occupational Disease*, Webster's Third New International Dictionary (2002) ("[A]n illness caused by factors arising from one's occupation.").

[7] While *Allen* renounced the unusual-event line of cases, it went on to say that under the Workers' Compensation Act, a claimant with a preexisting condition is required to show "an unusual or extraordinary exertion . . . to prove *legal causation.*" *Allen v. Indus. Comm'n*, 729 P.2d 15, 26 (Utah 1986) (emphasis

(cont.)

¶ 36 Under *Carling*, the term "accident" "connotes an unanticipated, unintended occurrence different from what would normally be expected to occur in the usual course of events." 399 P.2d at 203. But an injury by accident "is not necessarily restricted to some single incident which happened suddenly at one particular time and does not preclude the possibility that due to exertion, stress or other repetitive cause, a climax might be reached in such manner as to properly fall within the definition of accident." *Id.* Thus, in *Carling*, this court recognized that "cumulative trauma" or "repetitive trauma" can give rise to a claim under the Workers' Compensation Act.[8] *Carling*, however,

---

added). So, the question of an unusual or extraordinary exertion remains relevant when a claimant with a preexisting condition is attempting to prove legal causation for an injury under the Workers' Compensation Act. *See id.* at 25–27.

[8] Courts have used this "cumulative trauma" or "repetitive trauma" theory of injury by accident to find application of the Workers' Compensation Act to such injuries as back injuries and knee injuries. *See Specialty Cabinet Co. v. Montoya,* 734 P.2d 437, 440 (Utah 1986) (allowing compensation for a cabinet maker's back injury and a gym teacher's torn medial meniscus); *Kaiser Steel Corp. v. Monfredi*, 631 P.2d 888, 892 (Utah 1981) (upholding a determination that a miner's back injury resulted from an "accident," reasoning that the Commission's finding could reasonably be based on "a job-induced preexisting condition . . . hav[ing] reached . . . a 'climax' due to 'exertion, stress, or other repetitive cause'") (quoting *Carling v. Indus. Comm'n*, 399 P.2d 202, 203 (Utah 1965), *superseded on other grounds by* UTAH CODE § 63-44b-1 to -22 (1989)); *Smith's Food & Drug, Inc. v. Labor Comm'n,* 2011 UT App 67, ¶¶ 1, 14, 250 P.3d 1008 (affirming that a cheese cook's spondylosis could be classified as an accident resulting from "exertion, stress or other repetitive cause"). I note that Chief Justice Durrant faults me for citing *Specialty Cabinet*, claiming that this case upheld an award for a cabinet maker under the Workers' Compensation Act, despite finding no evidence of a climactic event under a theory of cumulative trauma injury by accident. I agree with the Chief Justice that the cited facts for the cabinet maker's injuries in that case do not point to a climactic event. *Specialty Cabinet*, 734 P.2d at 438. However, I do not cite this case

(cont.)

cautioned that courts must still be careful to distinguish such accidental injuries from occupational diseases, which it characterized as "gradually developing conditions." *Id.*

¶ 37  Earlier Utah case law defined occupational disease in a similar way.

> An accident . . . is distinguished from an occupational disease, in that it arises by some definite event, the date of which can be fixed with certainty, but which cannot be so fixed in the case of occupational diseases. . . . We are therefore of the opinion that the term occupational disease must be restricted to a disease that is not only incident to an occupation, but the natural, usual, and ordinary result thereof; and held not to include one occasioned by accident or misadventure.

*Young*, 90 P.2d at 176 (internal quotations marks omitted); *see also Tintic*, 206 P. at 281 ("If the injury is incurred gradually in the course of the employment, and because thereof, and there is no specific event or occurrence known as the starting point, it is held to be an occupational disease, and not an injury resulting from accident.").

¶ 38  These definitions track the definitions of "accident" and "occupational disease" in other jurisdictions and legal works.[9]

---

to endorse the awards we granted under the Workers' Compensation Act, especially if the facts of the injuries do not meet the requirements of the "cumulative trauma" theory of injury by accident. Instead, I cite *Specialty Cabinet* here merely as part of the history of when the court has granted compensation under the "cumulative trauma" theory of injury by accident.

[9] *See* 82 AM. JUR. 2D *Workers' Compensation* § 199 (2017) ("An 'accident' is an unanticipated, unintended occurrence different from what would normally be expected to occur in the usual course of events; the basic and indispensable ingredient of accident is unexpectedness."); *id.* § 284 ("[A] statutory occupational disease . . . involves disability, the onset of which is gradual and unheralded by any identifiable occurrence."); *id.* § 291 ("An occupational . . . disease is a disease or infirmity that

(cont.)

However, such "[d]efinitions . . . should always be checked against the purpose for which they were uttered." 4 ARTHUR LARSON ET AL., LARSON'S WORKERS' COMPENSATION LAW § 52.03[1] (2017). One early purpose of defining "occupational disease" was to distinguish occupational diseases from accidental injuries. The usual result of this distinction was to prevent the injured worker from receiving workers' compensation because "'occupational disease' was synonymous with the verdict 'noncompensable.'" *Id.* With the advent of occupational disease acts in the realm of workers' compensation, this context took on less importance. *Id.* This is because in many jurisdictions "it [became] . . . immaterial which category applie[d]" as the coverage offered for injuries by accidents and occupational diseases became roughly the same. *Id.* § 50.06. Therefore, the distinctions between the definitions of accident and occupational disease became less important in the case law because the categorization of the injury often made little or no difference to the compensation the employee was to receive for his or her injury. *Id.* § 52.03[1]. This was the case in Utah with respect to the scope of coverage until our decision in *Dale T. Smith & Sons v. Utah Labor Commission*, 2009 UT 19, 218 P.3d 580, where

---

develops gradually and imperceptibly as a result of engaging in a particular employment and that is generally known and understood to be a usual incident or hazard of that employment."); 99 C.J.S. *Workers' Compensation* § 359 (2017) ("[A]n occupational disease is one which develops over a period of time as opposed to an injury that is attributable to a one-time event."); *id.* § 334 ("An 'accident,' for workers' compensation purposes, has also been said to be an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration."); *id.* § 358 ("The terms 'accident' and 'occupational disease,' as defined generally, and in connection with provisions of compensation acts, are distinguishable in that an accident arises from a definite event, the time and place of which can be fixed, while the occupational disease develops gradually over a long period of time and also in the fact that the accident might easily have been avoided . . . .").

we held that the apportionment provision of the Occupational Disease Act applies to *all* forms of compensation under that Act, including medical benefits.[10] Now, because the Workers' Compensation Act has no similar apportionment provision, the question of whether an injury qualifies as by accident or as an "occupational disease" can matter greatly. The distinction means that the employee will be entitled to receive more or less compensation depending on which act is applied and that the employer (or its insurer) will be obligated to pay more or less compensation depending on how the injury is classified.[11]

---

[10] The specific language regarding apportionment in the Occupational Disease Act reads:

> The compensation payable under this chapter shall be reduced and limited to the proportion of the compensation that would be payable if the occupational disease were the sole cause of disability or death, as the occupational disease as a causative factor bears to all the causes of the disability or death when the occupational disease, or any part of the disease: (1) is causally related to employment with a non-Utah employer not subject to commission jurisdiction; (2) is of a character to which the employee may have had substantial exposure outside of employment or to which the general public is commonly exposed; (3) is aggravated by any other disease or infirmity not itself compensable; or (4) when disability or death from any other cause not itself compensable is aggravated, prolonged, accelerated, or in any way contributed to by an occupational disease.

UTAH CODE § 34A-3-110.

[11] Another context in which the distinction remained highly relevant in Utah is in the application of the time limits for bringing a claim. Under the 1943 and 1953 versions of the Workers' Compensation Act, a statute of repose operated to cut off all claims where "no claim for compensation [was] filed with the Industrial Commission within three years from the date of the accident or the date of the last payment of compensation." UTAH

(cont.)

¶ 39 Today, I would make clear that in keeping with this court's long-standing precedent, we should view injuries by accident and occupational disease as existing along a "spectrum" with extreme examples of workplace accidents on one end and similarly extreme examples of occupational diseases on the other. *See Smith's Food & Drug, Inc. v. Labor Comm'n*, 2011 UT App 67, ¶ 14, 250 P.3d 1008. I would also make clear that when characterizing an impairment along this spectrum, we should take into consideration the unexpectedness of the accident as well as the definiteness as to the occurrence of the injury. When an accident is unexpected and one can trace the occurrence of the injury to a definite time, then "one has the clearest example of a typical industrial accident . . . . At the other extreme, if [the unexpectedness and definiteness] elements are missing, one sees the typical occupational disease." 3 ARTHUR LARSON ET AL., LARSON'S WORKERS' COMPENSATION LAW § 42.02 (2017). And under our statutory scheme, the same injury cannot be both a workplace accident and an occupational disease at the same time. *See* UTAH CODE § 34A-2-102(1)(j)(ii) ("'Personal injury by accident arising out of and in the course of employment' does not include a disease, except as the disease results from the injury."). Consequently, it is at the center of the spectrum where the battle between classifying an injury as an occupational disease or as a workplace accident is fought.

¶ 40 I recognize that in the past we have spoken loosely regarding the classification of an accidental injury under the workers' compensation scheme. Therefore, I would clarify that definiteness of time as to the occurrence of (1) the cause of the injury and (2) the resultant injury are important factors in determining the categorization of a workplace injury. But the primary factor by which we should judge whether an injury results from an accident is whether the cause of the injury or result of the occurrence is unexpected or unintended. *See*

---

CODE § 42-1-92 (1943); *see also id.* § 35-1-99 (1953). However, under the Occupational Disease Act, a statute of limitations did not begin to run until the cause of action arose. *Id.* § 42-1a-49 (1943); *see also id.* § 35-2-48 (1953).

3 ARTHUR LARSON ET AL., LARSON'S WORKERS' COMPENSATION LAW § 42.02 (2017); *see also Allen*, 729 P.2d at 22.[12]

¶ 41 To determine if an occurrence satisfies the unexpectedness factor of the test, either the cause of the injury or the result of the occurrence must be unexpected. To determine if the cause of an injury is unexpected, one will ordinarily look to whether "something . . . broke, or interjected itself into, the usual course of the performance of the occupation." *Young*, 90 P.2d at 177. In other words, we should look to whether a mishap occurred. A slip and fall is a classic example of an unexpected cause. Often, however, the real controversy in this area of law is whether the result of an occurrence was unexpected, and thus an injury by accident.[13] To determine whether the result of an

---

[12] This is consistent with the history of workers' compensation cases in Utah and the country in general. The phrase "accident" in American workers' compensation jurisprudence traces back to the leading English case of *Fenton v. Thorley & Co.*, [1903] A.C. 433 (HL). 3 ARTHUR LARSON ET AL., LARSON'S WORKERS' COMPENSATION LAW § 42.02 (2017). As *Fenton*, and the American cases that followed, made clear, "[t]he basic and indispensable ingredient of 'accident' is unexpectedness." *Id.*; *see also Tintic Milling Co. v. Indus. Comm'n of Utah*, 206 P. 278, 282 (Utah 1922) (acknowledging the unexpected result rule of *Fenton*).

[13] In a review of our case law, we have consistently held that an unexpected result may be termed an injury by accident under the Workers' Compensation Act. The only case of ours that I have located to the contrary is *Young v. Salt Lake City*. 90 P.2d 174, 177 (Utah 1939) ("The unusual or the unexpected circumstance that classifies the illness as accidental must occur in the events leading up to the illness."). Our subsequent case law, however, is antagonistic to *Young* on this point. *See, e.g., Purity Biscuit*, 201 P.2d at 966 ("There is no requirement in the statute that the accident be the first in the chain of events which ultimately results in injury . . . . [I]t may be that the only accidental event is the resulting injury itself."). In *Purity Biscuit*, the court explained that workers' compensation may be awarded for unexpected results because "the distinction between accidental cause and accidental result was over the heads of parliament and of employer and

(cont.)

occurrence is unexpected, one ordinarily looks to whether there was an "unexpected internal failure of [an employee's] system to function normally." *Purity Biscuit Co. v. Indus. Comm'n*, 201 P.2d 961, 966 (Utah 1949).

¶ 42 At the opposite end of the spectrum are occupational diseases, which are not unexpected. Since occupational diseases are those "medically caused or aggravated by that employment," Utah Code § 34A-3-103, they are not unexpected in connection with an employee's work.[14] In addition, an occupational disease does not typically arise from a definite event, the time and place of which can be exactly pinpointed. As far back as *Tintic*, we recognized that occupational diseases typically are "incurred gradually." 206 P. at 281. *Carling* reaffirmed that notion, noting that workplace accidents "must be distinguished from gradually developing conditions which are classified as occupational diseases." 399 P.2d at 203. And *Allen* reiterated that distinction, stating that an injury by accident would have no evidence "that it developed gradually as with an occupational disease." 729 P.2d at 27. But not every occupational disease must occur gradually, as expectedness is our primary consideration in this context. This approach is consistent with the original version of the Occupational Disease Act. Although some of the twenty-seven

employee, and . . . the average person would consider he had met with an accident in either case." *Id.* at 967. Consequently, I believe that it is clear from our case law that an injury by accident is either the unexpected or unintended cause of an injury or result of an occurrence.

[14] I do not mean to suggest that courts rely on an analysis of which injuries are simply *more likely* to occur in a certain line of work. I focus instead on what medical evidence shows is incident to the usual performance of the occupation. For example, a worker may recover under the Workers' Compensation Act and not recover under the Occupational Disease Act for a heart attack where his job involves heavy lifting. Though the frequent exertion of heavy lifting may make it more likely that the employee has a heart attack than employees in sedentary lines of work, a heart attack is not medically understood to be incidental to the character of the work.

enumerated diseases had "rapid harmful effects," they were not contrary to the term of art understanding of occupational disease, as Chief Justice Durrant claims, because they were still not unexpected. *Infra* ¶ 116.

¶ 43   I note that there is criticism regarding the consideration of the definiteness of time as a factor when classifying an injury. *See* 3 ARTHUR LARSON ET AL., LARSON'S WORKERS' COMPENSATION LAW § 42.02 (2017). This criticism, as both Chief Justice Durrant and Justice Lee have pointed out, is not unfounded—I readily concede that the legislature can and should draw clearer lines in the workers' compensation context. And I agree with many of my colleagues' policy arguments. But in the absence of any statutory change beyond the streamlining accomplished by the 1991 amendments, *see infra* ¶¶ 45–48, we should adhere to our case law on this point. And the definiteness of time factor is one that is entrenched in our case law. *See, e.g., Carling*, 399 P.2d at 203 ("However, such an occurrence must be distinguished from gradually developing conditions which are classified as occupational diseases . . . ."); *see also Allen*, 729 P.2d at 27 (distinguishing an injury by accident where there was "no evidence which indicates that [the employee's] injury was predictable or that it developed gradually as with an occupational disease"); *Tintic*, 206 P. at 281 ("What is termed an accident must be something . . . definitely located as to time and place. If the injury is incurred gradually . . . and there is no specific event or occurrence known as the starting point, it is held to be an occupational disease . . . ."); *Smith's Food & Drug*, 2011 UT App 67, ¶ 13 ("The period of time in which [Claimant] experienced periodic shoulder pain was short until the pain evolved into chronic pain thereafter." (alteration in original)). In reviewing our case law, I conclude that our courts often look to the definiteness of time factor to help inform the "unexpectedness" inquiry in terms of whether a mishap occurred. This is why our cases have stated that "[t]he basic and indispensable ingredient of 'accident' is unexpectedness," while also looking at the definiteness of time as to the occurrence or onset of an injury. *Allen*, 729 P.2d at 22 (citation omitted). I believe the Chief Justice's criticism that adopting a test that includes definiteness of time as a factor leads to an "inequitable standard" is true when the length of time is the *sole* basis for determining whether workplace harm is an injury by accident or an occupational disease. *See infra* ¶ 89. In Utah,

however, the definiteness of time is a secondary factor in determining how to classify workplace harm, the primary factor being unexpectedness of cause of the injury or unexpectedness of the resultant injury. Indeed, neither JBS nor Ms. Rueda argue against inclusion of the definiteness of time as a factor in the test, and, in fact, JBS appears to argue that the definiteness of time should be the deciding factor in classifying a workplace harm. *See infra* ¶ 65 n.19. Given the prevalent inclusion of the definiteness of time factor in our case law, I am determinedly of the opinion that we are in no position to eliminate it, either wholly or in substantial part, from the analysis in classifying workplace harm based on a relatively minor change to the statutory scheme.

¶ 44   And it is the role of the definiteness factor that presents my principal point of departure from Justice Lee's opinion. Primarily for policy reasons, Justice Lee would demote definiteness to "only circumstantially relevant to the 'unexpectedness' of a given causal event." *Infra* ¶ 153. But this treatment represents, as I explain throughout my opinion, a substantial shift in our case law that cannot be squared with the legislature's minor 1991 amendments to the Occupational Disease Act. To quote Justice Scalia, legislatures do not "hide elephants in mouseholes" by altering "the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).[15]

¶ 45 Chief Justice Durrant's approach does even greater violence to the elephants-in-mouseholes doctrine. First, the Chief Justice applies inconsistent interpretive principles to the phrase "injury by accident" by arguing for a plain language

---

[15] Contrary to Justice Lee's opinion, I do not believe *Young* "unequivocally repudiated the 'definiteness' factor." *See infra* ¶ 162. Instead, *Young* rejected the idea, as do we, that definiteness should be the "governing" factor. But it stated that after determining whether an illness "is one commonly recognized as incident to the usual performance of the occupation"—i.e., whether it is unexpected—courts should "then ascertain if some definite circumstance took place of an unexpected or unusual nature." 90 P.2d at 177. I believe my analysis tracks *Young*'s approach of treating definiteness as a secondary factor.

interpretation of "injury" (and "disease"), but a term of art interpretation of "by accident." Second, wielding this novel interpretative approach, he proceeds to view the amendments to the Occupational Disease Act as creating a sea change in decades' worth of workers' compensation law.

¶ 46   I find Chief Justice Durrant's position commendable in its attempt to bring clarity to an admittedly muddled pair of statutory schemes. And I agree with the Chief Justice (and Associate Chief Justice Lee) that this is an area that the legislature should revisit. But in the absence of legislative clarification, I cannot agree with the Chief Justice's approach for two reasons. First, a plain language analysis is not appropriate where the terms "injury by accident" and "occupational disease" have developed specialized meanings and have not been undercut by statutory changes. Second, as pointed out above, there is no indication that the legislature intended such a massive shift in the scope of both the Workers' Compensation Act and the Occupational Disease Act when it amended the latter in 1991.[16]

¶ 47   A term of art approach for both "injury by accident" and "occupational disease" is consistent with principles of statutory interpretation, our case law, and the workers' compensation scheme of the majority of states. *Supra* ¶ 34 & n.6. Decades of judicial interpretation in workers' compensation cases have "become[] a gloss" on both the Workers' Compensation Act and the Occupational Disease Act. *Hackford v. Utah Power & Light Co.*, 740 P.2d 1281, 1283 (Utah 1987), *superseded by statute on other grounds by* UTAH CODE § 30-2-11, *as recognized in* Benda v. Roman Catholic Bishop of Salt Lake City, 2016 UT 37, ¶ 12, 384 P.3d 207. That gloss becomes, "in effect, part of the statute." *Id.* The

---

[16] Chief Justice Durrant also states that a shift away from the term of art understanding of "occupational disease" occurred in 1941, with the enactment of the Occupational Disease Act. However, the Chief Justice's position is ultimately moored to the 1991 amendments. *Infra* ¶ 124 ("By enacting the 1991 ODA, the legislature continued to reject our common law term of art definition of 'disease' and also jettisoned its own effort to define that term by enumerating twenty-seven specific diseases covered under the act."); *see also infra* ¶¶ 99, 108.

legislature is not operating in a vacuum; where it has not erased that gloss through new definitions, "the subsequent amendments suggest implicit legislative adoption of the judicially created definition." *Weyerhaeuser Co. v. Woda*, 998 P.2d 226, 230 (Or. Ct. App. 2000). The *Weyerhaeuser* court recognized that where—as here—the legislature has never provided a definition for "disease," the occupational disease statute "retains the use of the term 'disease,' which is a term that has acquired a specific definition that cannot simply be ignored." *Id.*

¶ 48 In fact, even language that predates the Occupational Disease Act's enactment operated to inform the legislature's word choice. Our decisions interpreting the Workers' Compensation Act, a sister statute to the Occupational Disease Act, go back nearly a century, providing key insight for what the term "disease" meant when the legislature enacted the Occupational Disease Act. *See Masich*, 191 P.2d at 615 ("The intent, purposes and objectives of the Occupational Disease Act, which is closely allied to the Work[ers'] Compensation Act, can be determined by reliance on former interpretations of the Work[ers'] Compensation Act . . . ."); *see also Tintic*, 206 P. at 280–83 (pre-Occupational Disease Act case discussing "injury by accident" and "disease"). Our cases after the Occupational Disease Act's enactment and the 1949 amendment continued our specialized meaning approach by fleshing out the factors of unexpectedness and timing. *See Carling*, 399 P.2d at 203 (describing occupational diseases as "gradually developing conditions"); *Allen*, 729 P.2d at 27 (noting that occupational diseases have the characteristics of being "predictable" and "develop[ing] gradually").

¶ 49 Indeed, the legislature never gave "disease" a definition inconsistent with our common-law gloss. Notably, it has never defined "disease" at all. Certainly "nothing in the language of the amended statute or its enactment history suggests that the legislature intended to abandon the [common-law] definition of the term." *Weyerhaeuser*, 998 P.2d at 229. Chief Justice Durrant himself seems to recognize that following the 1941 enactment of the Occupational Disease Act, our case law has consistently adhered to a term of art definition. *See infra* ¶ 85 (citing *Allen*, 729 P.2d at 18, 22). Our continued use of the term of art meanings after the 1941 enactment of the Occupational Disease Act and the 1949 and 1991 amendments is evidence that the legislature had

not abandoned the common-law definition. We are not in a position to reject all of our history in this area without a signal that the legislature intended such a sea change. Because the 1991 amendment to the Occupational Disease Act served primarily to simplify the Act and is closely aligned to the 1949 version, I believe we are compelled to continue using the term of art definitions rather than the Chief Justice's plain language approach. *Compare* UTAH CODE § 35-2-27(28) (1953) (defining "occupational disease" as "diseases or injuries to health which directly arise as a natural incident of the exposure occasioned by the employment" as long as there is a suitable nexus between the disease and the employment), *with* UTAH CODE § 34A-3-103 (2015) ("[A] compensable occupational disease means any disease or illness that arises out of and in the course of employment and is medically caused or aggravated by that employment.").

¶ 50 Additionally, Chief Justice Durrant's conclusion that by "any disease" the legislature meant to use an "ordinary" meaning for the term "disease" is based on an incorrect premise. When the legislature adopted the 1991 amendments, the Occupational Disease Act did not have a narrow definition of "disease" based only on the twenty-seven enumerated diseases. Instead, the Occupational Disease Act listed twenty-seven diseases and included a broader provision that provided coverage for any disease that qualified under a six-factor test. When the legislature jettisoned the specific list and adopted what was essentially a simplified version of the six-factor test from the previous version of the Occupational Disease Act, it does not follow that it meant to then abandon the prior term of art meaning of "occupational disease." The Chief Justice's analysis is further complicated by the fact that it adopts a plain language interpretation of "injury" and "disease," but splits the term "injury by accident" in order to apply a specialized meaning to "by accident." *Infra* ¶¶ 94–97. This approach contravenes principles of statutory interpretation by splitting a singular phrase into separate parts and applying disparate models of statutory interpretation to each part. *See Dist. of Columbia v. Heller*, 554 U.S. 570, 586–87 (2008) (rejecting interpretation that would give a literal interpretation to part of "keep and bear arms" and an idiomatic interpretation to another part). We have consistently referred to "injury by accident" as a cohesive phrase. *See Specialty Cabinet Co. v. Montoya*, 734 P.2d 437, 439 (Utah 1986) (referring to the term "injury by accident" as a

whole); *Allen*, 729 P.2d at 17 (same); *Purity Biscuit*, 201 P.2d at 968 (referring to "the [singular] term 'injury by accident'"). This phraseology spans centuries, continents, and countless cases.[17] *See, e.g.*, *Purity Biscuit*, 201 P.2d at 967 ("The English Workmen's Compensation Law was adopted in 1897 . . . [and] provided compensation for 'injury by accident' the same as ours."). We do not "only inquire into individual words and subsections in isolation; our interpretation of a statute requires that each part or section be construed in connection with every other part or section so as to produce a *harmonious whole*." *Anderson v. Bell*, 2010 UT 47, ¶ 9, 234 P.3d 1147 (internal quotation marks omitted), *superseded on other grounds by* UTAH CODE § 20A-1-306. I therefore

---

[17] Chief Justice Durrant correctly points out that this phrase is not always analyzed in its entirety. *Infra* ¶ 96 n.41. That is because, as often happens in the interpretation of language, one part of a phrase is more relevant to the analysis. But the Chief Justice's focus on courts' decisions to address only the relevant part of the phrase—or the separation of "injury" and "by accident" by a certain number of words—entirely misses the point. The importance of our treatment of "injury by accident" as a cohesive phrase is not that it can never be analyzed in part, but that a cohesive phrase should compel a cohesive interpretation. *See Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, ¶ 15, 301 P.3d 984 ("[W]e do not view individual words and subsections in isolation; instead our statutory interpretation requires that each part or section be construed in connection with every other part or section so as to produce a *harmonious whole*." (citation omitted)). Even the four cases the Chief Justice cites to that apply a plain language analysis do not split the phrase "injury by accident" or "accidental injury" and apply different interpretive models to each part. *See infra* ¶ 124 n.105. In fact, the Chief Justice cites to no case that takes that tack, nor did my research turn up such a case. And the separation of "injury" and "by accident" in Utah Code section 34A-2-401(1) does not imply that different interpretive models should be applied to each part, especially given that the definitions section of the Workers' Compensation Act uses the cohesive phrase "personal injury by accident." UTAH CODE § 34A-2-102(j).

disagree with the Chief Justice's application of two different interpretive methods to a singular phrase, and I interpret "injury by accident" as a whole and as a term of art.

¶ 51 Chief Justice Durrant criticizes my opinion for focusing on "by accident" rather than first classifying an impairment as an injury. I reject this premise. As I have explained, the term "injury by accident" is a term of art. My opinion restates and explains that term of art. Included in this restatement and explanation is a distinction that is central to the judicial gloss on "injury by accident" and "occupational disease" that the legislature has embraced: the distinction between an ailment brought on by a mishap (an injury by accident) and one medically understood to be caused by a certain kind of work. The Chief Justice is mistaken that I read the concept of a mishap into the term "injury by accident" by focusing only on the phrase "by accident." Instead, I read it into the term by focusing on the judicial gloss that has come to be coextensive with that term's meaning. I also disagree with the Chief Justice's effectively advocating a sweeping change to both the Occupational Disease Act and the Workers' Compensation Act. While the Chief Justice's desire to draw a clear line between injury by accident and occupational disease is a laudable one, I do not believe that it is possible to do so in this context. *See* 3 ARTHUR LARSON ET AL., LARSON'S WORKERS' COMPENSATION LAW § 42.02 (2017). Indeed, the line the Chief Justice wishes to draw would profoundly upset decades of workers' compensation precedent by now stating that any repetitive trauma can be compensated only as an injury by accident. It is too much to imagine that, in amending the Occupational Disease Act in 1991, the legislature intended to effect such a significant change in the workers' compensation arena without indicating such an intent or changing the language of the Workers' Compensation Act.

¶ 52 And Chief Justice Durrant's attempt to do so directly contradicts the legislative history. The sponsor of the 1991 amendments to the Occupational Disease Act stated that it was an update needed to "eliminate[] the unnecessary duplication of provisions" and streamline the "confusing" act, which did "not meet the needs of the 1990s." *Utah Occupational Disease Act Amendments: Hearing on S.B. 9 Before the House*, 1991 Gen. Sess. (statement of Sen. Lane Beattie). Nowhere in the floor votes did

any legislator indicate an intention to discard the term of art approach and redraw the lines of compensation in the way the Chief Justice proposes.

¶ 53 Such line drawing, while often valuable in the law because it creates clear demarcations and obvious outcomes, inevitably will create winners and losers. The legislature is much better positioned to draw those lines after hearing testimony than we are based upon the case before us. The current "line" between the Workers' Compensation Act and the Occupational Disease Act, while admittedly unclear, is based on factors that have developed in nearly a century of case law. There are weighty reliance issues at play in this area of the law and in the way that these cases have played out over such a long period of time. *See Eldridge v. Johndrow*, 2015 UT 21, ¶ 22, 345 P.3d 553 ("Our decisions have identified two broad factors that distinguish between weighty precedents and less weighty ones . . . . The second factor encompasses a variety of considerations, including the age of the precedent . . . and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned."). The 1991 amendments to the Occupational Disease Act were not an invitation by the legislature for us to step in and overrule a century of precedent, create a new test, and decide who the new "winners" and "losers" will be in the context of workers' compensation.[18]

¶ 54 A final problem with Chief Justice Durrant's approach is that it has the perverse implication that a definition that certainly was not aimed at *narrowing* the definition of an "occupational disease" does exactly that. For example, the Occupational Disease Act consistently listed "bursitis" as an occupational disease until the 1991 amendments. But bursitis does not fit under the Chief Justice's understanding of the ordinary meaning of disease because it does not "result from exposure to environmental hazards and foreign agents, such as bacteria, viruses, other germs,

---

[18] Furthermore, I do not share Chief Justice Durrant's faith that his lines, which even he concedes are unclear, will become clearer over time. *Infra* ¶ 135. Nor do I think it worth the risk to discard settled precedent for new precedent that shares the same fundamental defect as the old.

poisons, and toxins, or from inherent biological or genetic defects." *Infra* ¶ 130. Thus, the Chief Justice is forced to conclude that a clarifying amendment to the Occupational Disease Act that eliminated a specific list of diseases and instead stated simply that the Occupational Disease Act encompasses "any disease" has the effect of removing a previously recognized core disease from its ambit. I cannot accept this.

¶ 55 Having clarified the standard for determining whether an injury is by accident or an occupational disease, I proceed to address JBS's contention that the 1991 amendments to the Occupational Disease Act abrogated the "cumulative trauma" theory of injury by accident.

### A. The "Cumulative Trauma" Theory of Injury by Accident

¶ 56 The 1991 amendments changed the Occupational Disease Act to provide a remedy for "any disease or illness that arises out of and in the course of employment and is medically caused or aggravated by that employment." UTAH CODE § 34A-3-103. But that change did not, as JBS argues, abrogate the "cumulative trauma" theory of injury by accident.

¶ 57 JBS asks us to abandon the "cumulative trauma" theory of injury by accident as articulated in *Carling*. *See* 399 P.2d at 203 (injury by accident "is not necessarily restricted to some single incident which happened suddenly at one particular time"). Instead of that theory, JBS argues that we should adopt what it considers a more "common sense" line of demarcation, namely, that definiteness of time is the sole mechanism by which an injury should be classified either as by accident or as an occupational disease. Such a rule, JBS asserts, would give meaning to the 1991 Occupational Disease Act amendments while reining in the courts' overly broad definition of workplace accident under the Workers' Compensation Act.

¶ 58 The "cumulative trauma" theory of injury by accident is established by longstanding precedent, which we will overrule only "for the most compelling reasons." *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2010 UT 65, ¶ 23, 245 P.3d 184 (citation omitted). JBS, as the party asking us "to overturn prior precedent[,] ha[s] a substantial burden of persuasion." *Id.* (second alteration in original) (citation omitted). This burden, however, "is not equal[] . . . in all cases." *Eldridge*, 2015 UT 21, ¶ 22.

> Our decisions have identified two broad factors that distinguish between weighty precedents and less weighty ones: (1) the persuasiveness of the authority and reasoning on which the precedent was originally based, and (2) how firmly the precedent has become established in the law since it was handed down. The second factor encompasses a variety of considerations, including the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned.

*Id.*

¶ 59 As discussed below, all of these factors are present in this case, making the "cumulative trauma" theory of injury by accident "weighty precedent[]." *Id.* And because JBS has not met its heavy burden of persuading us to abandon this precedent, I decline the invitation to do so.

¶ 60 The first part of the test for departing from precedent requires us to consider "the persuasiveness of the authority and reasoning on which the precedent was originally based." *Id.* JBS does not argue that the "cumulative trauma" theory of injury by accident was originally erroneous. Indeed, the "cumulative trauma" theory of injury by accident, or similar "repeated trauma" or "repetitive trauma" theories appear to be well-recognized in the law. 4 ARTHUR LARSON ET AL., LARSON'S WORKERS' COMPENSATION LAW § 50.04 (2017) (The "repeated-trauma or cumulative-trauma doctrine appears to have originated with the House of Lords decision in *Burrell & Sons, Ltd. v. Selvage*, [90 L.J. 1340 (H.L. 1921)] . . . [I]t has had considerable acceptance in this country and accounts for many of the successful cases that lack brevity of both cause and result."); *see also Tokyo House, Inc. v. Hsin Chu*, 597 So. 2d 348, 350–51 (Fla. Dist. Ct. App. 1992) (stating that "repetitive trauma theory" exists "apart from occupational disease theory"); *Martin v. Cudahy Foods Co.*, 646 P.2d 468, 471 (Kan. 1982) (holding "that tenosynovitis when incurred through repetitive cyclic activities of an employee is an accidental injury within the meaning of the workmen's compensation act and not an occupational disease" because "it is more akin to accidental

injury from repetitive small traumas than to occupational disease"); *Hash v. Mont. Silversmith*, 810 P.2d 1174, 1176 (Mont. 1991) (recognizing "that a 'tangible happening of a traumatic nature' need not be a single isolated incident, but may well be a 'chain of incidents' leading to an injury"); *Macklanburg-Duncan Co. v. Edwards*, 311 P.2d 250, 255 (Okla. 1957) (holding "that . . . an injury . . . may be inflicted progressively and over a more or less lengthy period rather than being confined to infliction on one definite date and as the result of an isolated or particular event"). Given the theory's prevalence in the workers' compensation jurisprudence of not only Utah but throughout the country, I am not convinced that the "cumulative trauma" theory of injury by accident was originally erroneous.

¶ 61　The second part of the test focuses our analysis on "how firmly the precedent has become established in the law since it was handed down." *Eldridge*, 2015 UT 21, ¶ 22. In this inquiry, we consider many things, "including the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned." *Id.*

¶ 62　JBS argues that the "cumulative trauma" theory of injury by accident has become a "legal fiction . . . which has been stretched beyond all bounds of reasonableness to allow occupational disease claims to be filed as accidents." Specifically, JBS asserts that the legislature intended that the 1991 Occupational Disease Act amendments would expand coverage under the Occupational Disease Act and diminish coverage under the Workers' Compensation Act. But to read into the new language of the Occupational Disease Act an intention to abrogate the "cumulative trauma" theory of injury by accident under *Carling* and the Workers' Compensation Act requires too many inferences. Indeed, it requires an inference that the legislature meant to upend decades of established precedent regarding our workers' compensation jurisprudence without amending a single word of the Workers' Compensation Act. This strikes me as a most extraordinary leap that runs a great risk of usurping the legislature's policy-making prerogative. I decline such an interpretation of the Occupational Disease Act.

¶ 63   This conclusion is supported by all of the *Eldridge* factors mentioned above. First, we look to the "age of the precedent." *Id.* The "cumulative trauma" theory of injury by accident established in *Carling* is over fifty years old.

¶ 64   Next, we examine "how well [the theory] has worked in practice." *Id.* I am of the opinion that the theory appears to have worked well in practice. Our appellate courts have used it to grant compensation under the Workers' Compensation Act in only four cases. *See supra* ¶ 35 & n.8; *see also Nyrehn v. Indus. Comm'n*, 800 P.2d 330, 335 (Utah Ct. App. 1990). This does not strike me as a theory of injury by accident "stretched beyond all bounds of reasonableness." As a result, I conclude JBS's assertions that the theory is harmful to the workers' compensation system are unfounded.

¶ 65   We also must examine the theory's "consistency with other legal principles." *Eldridge*, 2015 UT 21, ¶ 22. I believe that the "cumulative trauma" theory of injury by accident is consistent with the legal principles of workers' compensation requiring that injuries by accident be compensated under the Workers' Compensation Act and occupational diseases be compensated under the Occupational Disease Act. While JBS argues that the current test for whether an injury is by accident "defies common sense and logic" and that the Occupational Disease Act amendments give us an opportunity to change the way the line between injuries by accident and occupational diseases has been drawn, this argument does not support JBS's argument that the "cumulative trauma" theory of injury by accident should be overruled.[19] An argument that the current rule is illogical is not

---

[19] JBS's proposed rule emphasizes definiteness of time as the basis for classifying injuries as by accident or occupational diseases. I worry that the change JBS advocates would bring about the very harm this court expressed concern over in *Young*. *See* 90 P.2d at 176 (considering and rejecting time as the basis for "determining the accidental nature of the illness"). As we explained in *Young*, to adopt this proposed rule "is to adopt a rule which may, in many cases, be governed by the bodily resistance of the individual. . . . Were we to adopt such a rule, the dividing line between an occupational disease and an accident would become

(cont.)

evidence that the Occupational Disease Act amendments abrogated the "cumulative trauma" theory of injury by accident under the Workers' Compensation Act. I certainly agree with JBS that there is a distinction between injuries by accident and occupational diseases; an injury by accident caused by "cumulative trauma" resulting in an acute event is not the same as the gradual onset of an occupational disease. But this is not to say that an occupational disease can never be caused by "cumulative trauma" as well. On the contrary, the classification of an injury caused by "cumulative trauma" depends on the circumstances surrounding the injury's unexpectedness and the definiteness of time as to the occurrence of the injury. There is nothing in the language of the "cumulative trauma" theory of injury by accident that requires courts to find that all injuries caused by "cumulative trauma" are necessarily caused by accident. Instead, the test is merely recognition that the term "accident" in the Workers' Compensation Act "does not preclude the possibility that due to exertion, stress or other repetitive cause, a climax might be reached in such a manner as to properly fall within the definition of an accident." *Carling*, 399 P.2d at 203. The case goes on to recognize that "such an occurrence must be distinguished from gradually developing conditions which are classified as occupational diseases." *Id.* The line between injuries by accident and occupational diseases is clearly contemplated and preserved under the language of the "cumulative trauma" theory of injury by accident. Therefore, it is up to courts and other adjudicative bodies to ensure that the line between injuries by accident and occupational diseases is preserved by analyzing the workplace harm for its unexpectedness and definiteness of time and classifying it accordingly. *See supra* ¶¶ 38–42.

¶ 66 Finally, we consider whether overturning the "cumulative trauma" theory of injury by accident now would create injustice or hardship in the realm of workers' compensation. *See Eldridge*, 2015 UT 21, ¶ 22. I conclude that it

---

extremely hazy as the periods of time for each approached unity." *Id.* Such a result is contrary to the purposes of the Workers' Compensation Act, which intends to compensate employees for workplace accidents only. *See Carling*, 399 P.2d at 203.

would. Undoubtedly, people have relied on this theory when deciding whether to file their claims under the Workers' Compensation Act or under the Occupational Disease Act. As stated above, there is no language in the 1991 amendments to the Occupational Disease Act that supports our overturning this precedent and at least one case has relied on this theory in making its ruling subsequent to the amendments. *See Smith's Food & Drug*, 2011 UT App 67, ¶¶ 12, 14. To overturn the precedent now, without any supporting statutory language and despite its age and the fact that litigants and courts continue to rely on it, would create injustice and hardship.

¶ 67 Therefore, although the 1991 amendments changed the language of the Occupational Disease Act, that language did not abrogate the "cumulative trauma" theory of injury by accident. JBS did not argue that the "cumulative trauma" theory of injury by accident was originally erroneous or that its original reasoning was unpersuasive. And, based on "the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned," I would not overrule the "cumulative trauma" theory of injury by accident. *Eldridge*, 2015 UT 21, ¶ 22. In conclusion, JBS has failed to meet its heavy burden of convincing us to abandon the "cumulative trauma" theory of injury by accident.

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE LABOR COMMISSION'S FINDING THAT MS. RUEDA'S INJURY RESULTED FROM "CUMULATIVE TRAUMA"

¶ 68 Ms. Rueda argues that the Labor Commission improperly classified her injury as a "cumulative trauma" injury. The Labor Commission, like the ALJ, largely adopted the medical panel's findings, determining that "Ms. Rueda's right-shoulder condition was a culmination of progressive cumulative trauma from her repetitive work duties." Ms. Rueda contends that this classification by the medical panel and the ALJ was "superfluous" and that the injuries "can more precisely be deemed specific individual workplace accidents with specific identifiable injuries."

¶ 69 Under the Utah Administrative Procedures Act, we review the order of the Labor Commission and not the underlying decision by the ALJ or the medical panel. *See* UTAH CODE § 63G-4-403(1) (granting this court "jurisdiction to review all final agency action resulting from formal adjudicative proceedings"). The standard of review for the Labor Commission's factual determination that Ms. Rueda was injured as a result of "cumulative trauma" is implicit in the language of the Administrative Procedures Act: we may "grant relief only if . . . the agency action is based upon a determination of fact, made or implied by the agency, that is not supported by substantial evidence when viewed in light of the whole record before the court." *Id.* § 63G-4-403(4)(g); *see Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 19, 308 P.3d 461 (explaining that subsection (4)(g) "implies a 'substantial evidence' standard"). We therefore consider whether the Labor Commission's finding of fact regarding Ms. Rueda's injury is supported by substantial evidence in the record. I conclude that it is.

¶ 70 The Labor Commission found that "Ms. Rueda's condition as of May 11, 2009, represented a culmination of progressive 'cumulative trauma' to her right shoulder" resulting from her work duties that began in 2007. This finding was adopted from the ALJ's order, which, in turn, was based largely on the medical panel's report. Ms. Rueda has not challenged the validity or accuracy of the report, contending only that the finding regarding progressive "cumulative trauma" was "superfluous." The Labor Commission, however, deemed the medical panel's analysis to be a "thorough and well-reasoned report."

¶ 71 In its report, the medical panel concluded that "Ms. Rueda suffered from a cumulative process that appears to have started in late 2007 and progressed slowly over time to the point of such severity that she ultimately was sent to have an injury formally reported on 5/11/09." The panel determined that the injury was "not specifically attributable to any event on 5/11/09." Instead, the panel attributed Ms. Rueda's injuries to "work activity that occurred over many months prior to 5/11/09." It determined that "[a]s a result of this longstanding, progressive 'cumulative trauma,'" Ms. Rueda's symptoms eventually became severe enough to warrant filing a claim, "even though no specific pathology can be identified to have occurred

on 5/11/09." Moreover, Ms. Rueda told the medical panel that her pain began "within days of starting employment . . . and it progressively got worse . . . [for] nearly 2 years" until she was sent to a doctor on May 11, 2009. She also "insisted to th[e] medical panel that she had no incident or specific injury on 5/11/09 and that th[e] pain had been present and worsening since 2007."

¶ 72   I find that this evidence provides substantial support for the Labor Commission's finding that Ms. Rueda's shoulder injury on May 11, 2009, resulted from "a culmination of progressive cumulative trauma."

### III. MS. RUEDA'S INJURY IS AN OCCUPATIONAL DISEASE UNDER THE OCCUPATIONAL DISEASE ACT

¶ 73   Although I decline to abrogate the "cumulative trauma" theory of injury by accident, and would affirm the Labor Commission's findings that Ms. Rueda's injury was caused by "cumulative trauma," I would hold that the Labor Commission incorrectly classified Ms. Rueda's injury as a workplace accident. As stated above, this is a mixed question of law and fact to which we give nondeferential review. *See supra* ¶¶ 19–21; *see also Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 36, 308 P.3d 461. And based on the medical panel's report and the Labor Commission's findings, I would hold that Ms. Rueda's injury is an occupational disease.

¶ 74   As we cautioned in *Carling v. Industrial Commission*, decision-makers must distinguish accidental injuries from those "gradually developing conditions which are classified as occupational diseases." 399 P.2d 202, 203 (Utah 1965). The case at hand presents an example where the injury is such that this "cumulative trauma" crosses the threshold from an injury by accident caused by "cumulative trauma" into the realm of occupational disease resulting from a cumulative or gradual process. Ms. Rueda's symptoms began in late 2007 when she started working for JBS and "progressed slowly over time to the point of such severity that [Ms. Rueda] ultimately was sent to have an injury formally reported on 5/11/09." "[N]o specific pathology [was] identified to have occurred on 5/11/09." Indeed, Ms. Rueda "insisted . . . that she had no incident or specific injury on 5/11/09" but instead her pain "progressively got worse to the

point that ultimately . . . 'they finally sent [her] to the doctor.'" The medical panel was careful to clarify whether the pain Ms. Rueda experienced on May 11, 2009, was different from before and whether a climactic event happened on that day. But Ms. Rueda "clearly stated . . . that nothing new happened" and that "[t]here was no new pain or different pain on 5/11/09 to that which she claim[ed] was present since 2007." While she stated that she heard a new popping noise in her shoulder that she had not previously heard, she insisted that the pain she experienced that day "was essentially the same as it had been for months."

¶ 75 Ms. Rueda's injury is thus different from the other injuries that our courts have found to be injuries by accident caused by "cumulative trauma" in the unexpectedness of the injury's occurrence and the gradualness of its occurrence. Ms. Rueda's injury was not reasonably unexpected. The job Ms. Rueda performed was "highly repetitive." And, as a result of her job, Ms. Rueda experienced almost constant pain for the two years she was employed at JBS. Nothing different happened to her on May 11, 2009, other than that her symptoms reached their logical conclusion and she was sent to a doctor. In contrast, the cheese cook's injury in *Smith's Food & Drug, Inc. v. Labor Commission* "was qualitatively different from the intermittent pain she had experienced" previously, and evidence supported the conclusion that "an 'acute event' caused [the cheese cook's] injury." 2011 UT App 67, ¶ 13, 250 P.3d 1008. While an accident "is not necessarily restricted to some single incident which happened suddenly at one particular time," an accident must be unexpected or unintended and thus often manifests itself as an "acute event." *Carling*, 399 P.2d at 203; *see also Smith's Food & Drug*, 2011 UT App 67, ¶¶ 3, 4, 11, 13. Here, Ms. Rueda experienced right upper extremity pain shortly after she began her job at JBS, and after two years of repetitive motions with her right arm she experienced symptoms severe enough to have them examined by a doctor. It cannot be the case that her ultimate injury was unexpected after such a long period of time performing the same repetitive work tasks while subject to such chronic pain.

¶ 76 Other cases that found an injury to be a compensable injury by accident caused by "cumulative trauma" occurred over a period of mere months. For example, in *Smith's Food & Drug*, the

cheese cook's pain occurred "over a period of several months" and "[t]he period of time in which [she] experienced periodic shoulder pain was short." 2011 UT App 67, ¶ 13. In *Nyrehn v. Industrial Commission*, the stock room clerk's back injury resulted from "two and a half months" of repetitive work activities. 800 P.2d 330, 335 (Utah Ct. App. 1990). Finally, in *Specialty Cabinet Co. v. Montoya*, the gym teacher's knee injury progressed over a period of a few months from January to April 1983. 734 P.2d 437, 438 (Utah 1986).[20] Ms. Rueda's injury, which occurred over a period of two years, was not reasonably unexpected and too gradual to be classified as an injury by accident; as a result, on the spectrum of work-related injuries, her injury is more appropriately viewed as an occupational disease.

¶ 77  In conclusion, because Ms. Rueda's injury was gradual and—in light of Ms. Rueda's history of pain under the work conditions—not unexpected, the injury more appropriately falls on the occupational disease side of the workers' compensation spectrum than on the injury by accident side.

## CONCLUSION

¶ 78  JBS has not, in my view, met its burden to convince us that the 1991 amendments to the Occupational Disease Act abrogated the "cumulative trauma" theory of injury by accident. Furthermore, I am of the opinion that there was substantial evidence supporting the Labor Commission's finding that Ms. Rueda's injury was caused by "cumulative trauma." Finally, I would conclude that Ms. Rueda's injury should be classified as an occupational disease under the Occupational Disease Act. Therefore, I would affirm the factual findings of the Labor Commission in its final order, but would reverse its determination that Ms. Rueda's injury was compensable under the Workers' Compensation Act.

---

[20] I cite this case only to the extent it describes the gym teacher's injury as progressing over a period of a few months.

CHIEF JUSTICE DURRANT, opinion:

¶ 79 The Workers' Compensation Act (WCA) provides compensation to employees for any "injury by accident arising out of and in the course of employment."[1] The Occupational Disease Act (ODA), in contrast, provides compensation for "any disease or illness that arises out of and in the course of employment and is medically caused or aggravated by that employment."[2] The WCA specifically does not provide compensation for "disease[s],"[3] while the ODA specifically states that it does not provide compensation for injuries covered by the WCA.[4] Thus, the legislature has made clear that for purposes of the WCA and ODA a particular type of harm to an employee cannot be both an injury and a disease. It is one or the other. This difference is an important one because compensation for a disease under the ODA is often reduced in cases where compensation for an injury under the WCA would not be.[5]

¶ 80 We are charged, then, with distinguishing between the sets of harms covered by the WCA—injuries by accident—and those covered by the ODA—occupational diseases. Because we have not yet addressed the scopes of these two acts in light of the recent amendments to the ODA, this is a question of first impression. It is a question that is complicated by the fact that the legislature has not fully defined the terms "injury," "disease," or "accident," as used in these two compensation acts. And it is further complicated by the fact that the legislature has offered no rationale for compensating an employment-caused disease at a lower rate than an employment-caused injury. Nor can I think of one. Regardless, we are charged with distinguishing between those harms covered by the WCA and the ODA.

---

[1] UTAH CODE § 34A-2-102(1)(j)(i)–(ii); *id.* § 34A-2-401(1).

[2] *Id.* § 34A-3-103.

[3] *Id.* § 34A-2-102(1)(j)(ii).

[4] *Id.* § 34A-3-111.

[5] *See supra* ¶ 38.

¶ 81   Below, I begin by reviewing Justice Himonas's approach and some of the practical problems that I see with it. I then discuss the two relevant statutes in turn, reviewing Justice Himonas's interpretation of each one and explaining why I believe that interpretation is erroneous. I also describe what I believe to be the proper way of interpreting and harmonizing the two statutes, relying on both the plain meaning and the history of the statutes to conclude that the WCA covers all "injuries" while the ODA covers all "diseases" as those terms are commonly understood. Under this standard, I conclude that Ms. Rueda's harm should be categorized as an "injury" and should be evaluated under the WCA. And because I agree with Justice Himonas that we should not abandon the cumulative trauma theory that is part of the term of art "by accident" and that the Labor Commission's findings were supported by substantial evidence, I would affirm the Commission's ruling.

### I. Justice Himonas's Approach Fails to Make the Proper Distinction Between the Scopes of the WCA and ODA

¶ 82   Justice Himonas and I agree that the scope of the WCA and the scope of the ODA are primarily to be understood in contrast to one another, i.e., that whatever is covered under one act cannot be covered under the other. This conclusion follows from the express provisions of the statutes. First, the WCA states that it covers "injur[ies] by accident" but specifically excludes from its scope "disease[s],"[6] which we have interpreted as "occupational diseases."[7] Thus, whatever the WCA covers, it cannot include "occupational diseases." The ODA, on the other hand, covers "occupational diseases,"[8] but expressly states that it does not compensate the "injuries by accident" that are covered

---

[6] *See* UTAH CODE § 34A-2-102(1)(j)(ii). As I discuss below, although not all harms that fall within the scope of the WCA may be compensable, the scope of the statute reaches all "injuries"—everything except "diseases."

[7] *See Pinyon Queen Mining Co. v. Indus. Comm'n*, 204 P. 323, 326 (Utah 1922).

[8] UTAH CODE § 34A-3-103.

by the WCA.[9] Thus, each statute covers a mutually exclusive set of harms.

¶ 83  Justice Himonas has made a yeoman effort to define the key terms of the statutes—"injury," "accident," and "occupational disease"—and to harmonize the WCA and ODA. And in doing so he has attempted to be consistent with our very inconsistent caselaw. But I believe that Justice Himonas's approach is fundamentally flawed because it rests on the premise that the distinction between the scope of the WCA and the scope of the ODA turns on the difference between "injuries by accident" and "occupational diseases" as those terms have been understood in our caselaw. This premise requires Justice Himonas to fashion a test for distinguishing the scopes of the statutes that is unclear, and, in my mind, both unsupported by the statutory language and potentially inequitable. Instead, I believe that the proper distinction to be made is between the ordinary meaning of "injuries" and "diseases," which distinction is both compelled by the statutory language and has long been recognized by other states.

*A. Justice Himonas's Approach Relies on the Distinction
Between the Common Law Terms of Art
"Injury by Accident" and "Occupational Disease"*

¶ 84  According to Justice Himonas, the appropriate analysis contrasts "injuries by accident"[10] with "occupational disease" as those terms have been understood in our caselaw. Under Justice Himonas's approach, potentially compensable harms fall along a

---

[9] *Id.* § 34A-3-111 (providing that compensation is not available under the ODA "in all cases when injury results by reason of an accident arising out of and in the course of employment").

[10] Justice Himonas phrases the harms covered by the WCA as alternatively "injuries by accident," "workplace accidents," or simply "accidents." *See supra* ¶¶ 34–39. But Justice Himonas never defines "injuries" apart from "accidents" and bases his discussion of the scope of the WCA on its definition of "accidents." *See supra* ¶¶ 34–39. For simplicity's sake, I will simply use the term "injury by accident" to refer to Justice Himonas's understanding of the harms covered by the WCA.

spectrum. At one end are those harms covered by the WCA—
"injuries by accident." At the other are those covered by the
ODA—"occupational diseases." In order to determine where on
the spectrum a particular harm lies, Justice Himonas looks to the
factors established in our caselaw interpreting the terms "injury
by accident" and "occupational disease."

¶ 85 In our caselaw, the term "by accident" is defined to
encompass "*either* the cause *or* the result of an injury,"[11] and may
refer to a harm arising from a "single incident which happened
suddenly at one particular time" or may refer to a harm emerging
more gradually "due to exertion, stress or other repetitive cause
[that reaches] a climax."[12] An occupational disease, on the other
hand, has been defined as a "gradually developing condition[]."[13]
Justice Himonas has distilled these two term-of-art meanings into
two factors that determine whether a harm in a given case falls
more on the "injury by accident" or the "occupational disease"
side of its compensation spectrum. First, Justice Himonas looks to
"the unexpectedness of the [harm]," which can be found in either
the "cause of the injury or result of the occurrence." Second, he
looks to "the definiteness as to the occurrence of the [harm],"[14]
which looks to the time it takes for the harm to develop, and
whether the harm can be identified as resulting from discrete
events.

¶ 86 So the same ultimate condition can be either an injury by
accident or an occupational disease depending on how it
develops, how long it takes to develop, and whether it "result[s]
in an acute event."[15] If the harm is unexpected—i.e., either caused
by an unexpected event (or series of events) or is the unexpected
result of ongoing stress—and has a more definite occurrence—i.e.,
it can be traced to specific incidents or it arose over a relatively
short period of time—it is an "injury by accident" and

---

[11] *Allen v. Indus. Comm'n*, 729 P.2d 15, 22 (Utah 1986).

[12] *Id.* at 18 (citation omitted).

[13] *Id.* (citation omitted).

[14] *Supra* ¶ 39.

[15] *Supra* ¶ 65.

compensable under the WCA. If, on the other hand, the harm is a more expected result of ongoing stress that either cannot be easily traced to discrete incidents or emerged over a longer period of time, it is an "occupational disease" and compensable under the ODA.

¶ 87 Justice Himonas's construct for distinguishing between injuries by accident and occupational diseases leads to perplexing results. The cheese cook whose shoulder pain occurs over a period of several months,[16] the stock room clerk whose back injury emerged over two and a half months,[17] and the gym teacher whose knee injury progressed over a period of a few months[18] are all compensated at a higher rate than they would be if, like Ms. Rueda, they had soldiered on for two years. Ms. Rueda's pain, which would be deemed an "unexpected" result for the first few months and therefore an accident, eventually, at some point over the course of two years, became "not reasonably unexpected,"[19] "too gradual to be classified as an injury by accident," and

---

[16] *See Smith's Food & Drug, Inc. v. Labor Comm'n*, 2011 UT App 67, ¶ 13, 250 P.3d 1008.

[17] *See Nyrehn v. Indus. Comm'n*, 800 P.2d 330, 335 (Utah Ct. App. 1990).

[18] *See Specialty Cabinet Co. v. Montoya*, 734 P.2d 437, 438 (Utah 1986).

[19] Justice Himonas stops short of stating that Ms. Rueda's harm was expected, stating instead only that it was "not reasonably unexpected." *Supra* ¶¶ 74–75. This description seems to blur the line between "unexpected" and "expected," leading to an inherently ambiguous test to be applied in future cases. I see no principled basis to distinguish Ms. Rueda's shoulder pain from all of the other individuals' pains described above; all of the individuals' harms resulted from repeated motions made at work, and their pain "reached [its] logical conclusion" when the individual determined that they could no longer stand working with the pain and received treatment. *See supra* ¶ 75. It would seem that, under Justice Himonas's framework, either all of these individuals' harms should be considered injuries by accident or they should all be considered occupational diseases.

accordingly somehow morphed into a disease.[20] Although Justice Himonas recognizes that "under our statutory scheme, the same injury cannot be both a workplace accident and an occupational disease at the same time,"[21] his test ultimately does permit the same harm—be it a torn rotator cuff or silicosis—to be categorized as either an injury by accident or an occupational disease in different cases based on hard-to-define factors.

¶ 88 I believe that Justice Himonas, despite his insistence to the contrary, has "adopt[ed] a rule . . . governed by the bodily resistance of the individual."[22] Indeed, though Justice Himonas attempts to describe the consideration of the time a particular harm took to emerge as only "a secondary factor," with "the primary factor being unexpectedness of cause of the injury or unexpectedness of the resultant injury,"[23] his application of his own standard belies his assertion.

¶ 89 Under Justice Himonas's approach, the only way I see to distinguish between an unexpected harm emerging from repetitive motion—an injury by accident—and a "not reasonably unexpected" harm emerging from repetitive motion—an occupational disease—is to look either to the length of time involved or to whether there was some "definite time"[24] or "definite event"[25] when the harm emerged or worsened. The problem with the former distinction is that it makes the length of time an individual suffered before seeking medical attention determinative of compensation—a result everyone agrees is erroneous. The problem with the latter distinction is that some of our prior cases—cases reaffirmed by Justice Himonas today—have required no such definite occurrence in awarding

---

[20] *Supra* ¶ 76.

[21] *Supra* ¶ 39.

[22] *Young v. Salt Lake City*, 90 P.2d 174, 176 (Utah 1939); *see also supra* ¶ 43.

[23] *Supra* ¶ 43.

[24] *Supra* ¶ 39.

[25] *Supra* ¶¶ 37, 42.

compensation for injuries under the WCA.[26] Thus, we have an unclear and, in my view, potentially inequitable standard based on inconsistent caselaw.

¶ 90   Again, I do not fault Justice Himonas for his attempt to bring some order both to a statutory scheme that is far from clear and to our caselaw, which is also less than a model of clarity. But I would approach the task differently, in a way that I believe better follows the statutory language and is in harmony with other states' approaches to this issue. Below I address each statute, beginning with the WCA, in order to explain both why Justice Himonas's approach—which relies on the terms of art "by accident" and "occupational disease"—does not align with the legislative intent expressed in the two statutes and why a plain language approach is necessary.

### B. The Language of the Statutes Reveals that Their Scopes Depend on the Ordinary Meaning of "Injury" and "Disease"

¶ 91   Justice Himonas approaches the task of defining the two sets of mutually exclusive harms created by the statutes by envisioning a spectrum between the WCA and ODA, classifying

---

[26] For example, Justice Himonas supports his argument that Ms. Rueda's harm was an occupational disease with *Specialty Cabinet Co. v. Montoya*, 734 P.2d 437 (Utah 1986), wherein we held that a cabinet maker's back pain, which "did not result from any specific event or activity [but] developed in the course of [the employee's] routine work of designing and building cabinets," was an injury by accident because it was "the unexpected and unintended result of exertions which occurred at work and in the course of . . . employment." *Id.* at 438–39. Justice Himonas states that he cites this case "only to the extent it describes the . . . injury as progressing over a period of a few months," but by so doing, Justice Himonas has reinforced that the only distinguishing factor between *Specialty Cabinet* and Ms. Rueda's case is the time involved. *Supra* ¶ 76 n.20. Both involve injuries resulting from routine workplace exertions, but one injury is "unexpected" because it emerged over "a few months," while the other injury— Ms. Rueda's—is "not reasonably unexpected" because it was more gradual. *Supra* ¶ 76.

harms as "injuries by accident" or "occupational diseases" based on certain factors derived from our caselaw. I disagree. I believe that the statutes require a categorical approach, where a harm is categorized at a threshold level as either falling within the scope of the WCA or the ODA. And, unlike Justice Himonas, I think the central distinction between the two statutes' scopes—and thus the key to the categorization—is found in the difference between the ordinary meaning of the terms "injury" and "disease," not in the difference between the term of art understandings of "injury by accident" and "occupational disease," as Justice Himonas suggests. Although the statutes could be clearer, I believe their language and history requires this approach, which is the same approach taken by a majority of other states that have considered this issue.[27]

---

[27] Of the five states to address the distinction between a "disease" and an "injury" under statutory schemes similar to ours, four have taken a plain language approach. *See, e.g.*, *Luttrell v. Indus. Comm'n*, 507 N.E.2d 533, 541–42 (Ill. App. Ct. 1987) (using a plain language approach to describe how "'injury' is distinguished from a 'disease'"); *Duvall v. ICI Ams., Inc.*, 621 N.E.2d 1122, 1124–26 (Ind. Ct. App. 1993) (same); *Noble v. Lamoni Prods.*, 512 N.W.2d 290, 294–95 (Iowa 1994) (same); *Pee v. AVM, Inc.*, 543 S.E.2d 232, 234–37 (S.C. Ct. App. 2001) (same), *aff'd*, 573 S.E.2d 785 (S.C. 2002). The fifth state, Oregon, rejected a plain meaning approach and instead employed a term of art approach consistent with Justice Himonas's opinion today. *See Weyerhaeuser Co. v. Woda*, 998 P.2d 226, 227–31 (Or. Ct. App. 2000). In *Weyerhaeuser*, the Oregon Court of Appeals reasoned that because Oregon courts had adopted the common law term of art definition of "occupational disease" in the context of its workers' compensation statute, and because "since the adoption of that definition by the Supreme Court, the legislature has not defined the term differently and has not enacted language that is inconsistent with the judicially created definition," but rather had implicitly adopted that definition, it would continue to use the term of art and not a plain language understanding. *Id.* at 230. As discussed below, *infra* ¶ 114, the *Weyerhaeuser* court's logic is inapposite here because our legislature has specifically adopted a statutory definition of "occupational disease" that conflicts with

(cont.)

1.  The WCA Covers "Injuries," Not "Injuries by Accident"

¶ 92 The WCA covers "injur[ies] by accident arising out of and in the course of employment" and excludes only "disease[s]."[28] Justice Himonas reads the phrase "injury by accident" as a single, indivisible concept. He accordingly explains the scope of the WCA according to what he describes as the term of art understanding of "injury by accident." In my view, though I agree that the term "by accident" is indeed a term of art with the meaning described by Justice Himonas, I do not believe that term defines the scope of the WCA. Instead, the phrase "by accident," in conjunction with the phrase "arising out of and in the course of employment" defines only whether an "injury"—a harm that has been categorized as falling within the scope of the WCA—is compensable.

¶ 93 First, I agree with Justice Himonas that the phrase "by accident" or "accident," is a term of art within the context of the WCA that has been incorporated into the statute. When the WCA was first enacted, it contained the same "by accident" language at issue today.[29] As Justice Himonas has discussed, we have a long line of cases interpreting this phrase. There are two aspects of our interpretation of "accident" relevant today. First, as Justice Himonas points out, we have adopted a broad interpretation of the term, holding "that an accident is an unexpected or unintended occurrence that may be *either* the cause *or* the result of an injury."[30] Second, and as part of that broad interpretation of the term "accident," we have adopted the "cumulative trauma" theory of accident. Under this theory, an "accident" "is not necessarily restricted to some single incident which happened suddenly at one particular time," but instead includes

---

the common law term of art understanding of that phrase. Accordingly, there is no basis for rejecting a plain meaning approach in Utah.

[28] UTAH CODE § 34A-2-102(1)(j)(i)–(ii); *see also id.* § 34A-2-401(1).

[29] *See Chandler v. Indus. Comm'n*, 184 P. 1020, 1021 (Utah 1919).

[30] *Allen*, 729 P.2d at 22.

"accident[s]" that emerge over time "due to exertion, stress or other repetitive cause [that reach] a climax."[31]

¶ 94 Because the legislature has amended and reenacted the WCA many times over the past century without amending or changing the "by accident" language, we presume it has approved of and adopted our interpretation.[32] Thus, the term "accident" in the WCA is no longer understood according to its ordinary meaning, but as a term of art as described above. But although Justice Himonas and I agree that the phrase "by accident" in the WCA is to be understood as a term of art, we disagree as to the stage at which that understanding becomes applicable. Justice Himonas relies on the term of art "by accident" at the threshold, categorization stage to determine the scope of the WCA. I, on the other hand, believe that the term of art does not apply to the threshold question of what harms are covered by the WCA, but rather goes only to whether a harm that has already been classified as falling within the scope of the WCA—an "injury"—is compensable.

¶ 95 Although the legislature has not clearly defined the extent of the statute's scope, its language guides the inquiry that we must make. The WCA repeatedly states that it applies to "injuries,"[33] and our caselaw confirms that its scope is focused on

---

[31] *Id.* at 18 (citation omitted).

[32] *See Christensen v. Indus. Comm'n*, 642 P.2d 755, 756 (Utah 1982) ("[W]here a legislature amends a portion of a statute but leaves other portions unamended, or re-enacts them without change, the legislature is presumed to have been satisfied with prior judicial constructions of the unchanged portions of the statute and to have adopted them as consistent with its own intent.").

[33] *See* UTAH CODE § 34A-2-401(1)(a) (compensating "loss sustained on account of . . . injury"); *id.* § 34A-2-401(1) (compensating "[a]n employee . . . who is injured . . . wherever such injury occurred"); *id.* § 34A-2-102(1)(j)(i) (including within the scope of the act "an injury caused by the willful act of a third person"); *id.* § 34A-2-105(1) ("The right to recover compensation pursuant to this chapter *for injuries* sustained by an employee . . .

(cont.)

"injuries"[34] and not "injuries by accident."[35] Justice Himonas's focus on the "by accident" language mistakes the relevant standard by conflating compensability with categorization. The WCA states that it covers "injur[ies] by accident arising out of and in the course of employment."[36] And as other states have recognized when interpreting similar statutory schemes, the WCA's definition of its scope implicitly requires "threshold proof of [injury]" as a "prerequisite to recovery."[37] It "assumes that the employee suffers from [an 'injury'] and focuses on whether the

---

is the exclusive remedy against the employer . . . ." (emphasis added)).

[34] *See, e.g.*, *Wash. Cty. Sch. Dist. v. Labor Comm'n*, 2015 UT 78, ¶ 1, 358 P.3d 1091 (discussing "the scope of the Utah Workers' Compensation Act" as it related to "an initial workplace injury and a subsequent non-workplace injury").

[35] Our cases have long recognized that the "by accident" language is only a "prerequisite[] for a finding of a compensable injury," not a description of the type of harms covered by the WCA, as Justice Himonas has treated it. *Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 44, 308 P.3d 461 (describing the Workers' Compensation Act as covering injuries and noting that the "statute creates two prerequisites for a finding of a *compensable* injury" (emphasis added) (citation omitted)); *Allen*, 729 P.2d at 18 (same); *see also Salt Lake City v. Indus. Comm'n*, 74 P.2d 657, 659 (Utah 1937) ("A mere accident does not impose the duty to pay.").

[36] UTAH CODE § 34A-2-102(1)(j)(i); *see also id.* § 34A-2-401(1).

[37] *See Noble*, 512 N.W.2d at 294 ("[T]he statutory criteria upon which [the claimant] relies *presume* the existence of a *disease*. The factors cited relate solely to proof of causation. Were threshold proof of disease not a prerequisite to recovery under [the ODA], many disabilities arising from clearly traumatic injuries would also meet [the ODA's] requirements. Such a circumstance would contravene the clear intent of [the WCA and ODA] to make recovery under the two chapters mutually exclusive.").

[injury] is causally connected to workplace conditions"[38] and is "by accident."[39]

¶ 96   Because the WCA's scope is tied to the existence of an "injury," the statutory definition of the act's scope is incomplete. It presumes the existence of an injury and discusses only the requirements for an injury to be compensable—that it be "by accident" and "aris[e] out of and in the course of employment."[40] I believe the proper way to resolve this issue is to use our usual tools of statutory interpretation to interpret the key term "injury." And because the legislature has not indicated that the term "injury" should be understood in a technical way, we should rely on our usual plain language approach to interpret "injury" according to its ordinary meaning.[41]

---

[38] *Duvall*, 621 N.E.2d at 1125.

[39] UTAH CODE § 34A-2-102(1)(j)(i).

[40] *Id.*; *see Noble*, 512 N.W.2d at 294 ("The commissioner wisely observed that the statutory criteria upon which [the claimant] relies *presume* the existence of a *disease.* The factors cited relate solely to proof of causation.").

[41] Justice Himonas claims this approach involves "splitting a singular phrase into separate parts and applying disparate models of statutory interpretation to each." *Supra* ¶ 50. But our cases have not "consistently" treated the words "injury by accident" as a "singular phrase." *Supra* ¶ 50. To the contrary, we have often analyzed the words "by accident" in isolation. *See Specialty Cabinet Co.*, 734 P.2d at 439 ("These cases . . . both involve the troublesome problem of determining whether internal failures satisfy the 'by accident' standard of [Section 34A-2-401]."); *Allen*, 729 P.2d at 22 ("[W]here either the cause of the injury *or* the result of an exertion was different from what would normally be expected to occur, the occurrence was unplanned, unforeseen, unintended and therefore 'by accident.'"); *Hone v. J.F. Shea Co.*, 728 P.2d 1008, 1011 (Utah 1986) ("Whether the claimant had a preexisting condition is relevant to the issue of causation, but is not determinative of whether the injury occurred 'by accident.'"). Indeed, the text of Utah Code section 34A-2-401(1) is inconsistent with the notion that "injury by accident" constitutes a "singular phrase." It

(cont.)

¶ 97 Ultimately, because the scope of the WCA is not defined by the term of art "by accident," an analysis of that term of art is simply irrelevant to the threshold issue we decide today—which compensation act applies to Ms. Rueda's harm. Only after the

provides that "[a]n employee described in Section 34A-2-104 who is injured and the dependents of each such employee who is killed, by accident arising out of and in the course of the employee's employment, wherever such injury occurred, if the accident was not purposely self-inflicted, shall be paid" certain compensation. Notably, the terms "injur[y]" and "by accident" are separated by ten words, the "by accident" term appears in a phrase that is set off by commas, and the word "injury" appears a second time unaccompanied by the words "by accident."

Justice Himonas also argues that cases from other jurisdictions "that apply a plain language analysis do not split the phrase 'injury by accident' or 'accidental injury' and apply different interpretive models to each part." *Supra* ¶ 50 n.17. But a review of cases from those states reveals the opposite is true. These courts have assessed whether a harm is properly categorized as an "injury" or a "disease," according to the plain meaning of those terms, separately from whether the harm occurred "by accident," treating the phrase "by accident" as a legal term of art. *See Duvall*, 621 N.E.2d at 1125–27 (analyzing whether carpal tunnel syndrome is an "injury" or a "disease" separately from whether it is "by accident," entitling the claimant to compensation); *Pee*, 543 S.E.2d at 236 (noting, after separately assessing whether the harm in question was a disease or an injury, that "[t]o be compensable under the [Workers' Compensation] Act, the *injury* must be an 'injury by accident arising out of and in the course of the employment'") (emphasis added) (citation omitted); *Luttrell*, 507 N.E.2d at 541–42 (noting, separately from any discussion of the "accidental" nature of the injury, that "it is quite generally recognized that an 'injury' is distinguished from a 'disease' by virtue of the fact that an injury has its origin in a specific, identifiable trauma or physical occurrence or, in the case of repetitive trauma, a series of such occurrences. A disease, on the other hand, originates from a source that is neither traumatic nor physical . . . ."); *Noble*, 512 N.W.2d at 295 (quoting *Luttrell* in explaining the distinction between an "injury" and a "disease").

threshold determination has been made that a harm is an "injury" and covered by the WCA should we look to whether the injury was "by accident" to determine whether that injury is compensable. Justice Himonas's approach, which relies on the term of art "by accident" to define the scope of the WCA, conflates the separate inquiries of categorization and compensability. I turn now to a discussion of the ODA and the definition of "disease."

2. The ODA Covers "Diseases," Not "Occupational Diseases"

¶ 98  The ODA covers "any disease or illness that arises out of and in the course of employment and is medically caused or aggravated by that employment."[42] As noted above, the WCA covers "injur[ies]," but expressly excludes from its scope "disease."[43] So the key term in determining the scope of the ODA is "disease."[44]

---

[42] UTAH CODE § 34A-3-103.

[43] *See id.* § 34A-2-102(1)(j)(ii) ("'[I]njury by accident arising out of and in the course of employment' does not include a disease.").

[44] The statute defines an "occupational disease" as "any disease or illness." Because there does not appear to be a relevant distinction between "disease" and "illness," and due to the WCA's statutory exclusion of "diseases," I will follow Justice Himonas's example and simply use the word "disease" to refer to the harms excluded from the scope of the WCA and covered by the ODA. *See Illness*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011) ("1a. Poor health resulting from disease of body or mind; sickness. b. A disease."); *Illness*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("2. A disease of the body or mind; disorder of health.").

Justice Lee argues that the canon of independent meaning suggests that "illness" should be given a broad meaning so as to add something that "disease" does not convey. *Infra* ¶ 180. But that canon, like all canons, must yield to contrary indications in the statutory scheme. Here, Justice Lee's argument is that "illness" should be read so broadly as to encompass "any malady" or any "unhealthy condition of body or mind." *Infra* ¶ 180. But this interpretation suffers from the same deficiency as Justice

(cont.)

¶ 99 Justice Himonas interprets this key term in both the WCA[45] and the ODA[46] as incorporating the common law term of

---

Himonas's approach—it threatens to permit the same type of harm to fall within the purview of both the WCA and the ODA, a result that, as I explain, is contrary to the legislature's clear intent to create two independent compensation schemes with no overlap. For example, consider two employees who suffer lead poisoning. The first is a painter who routinely uses lead paint at work. The second is an office worker who comes in contact with a tainted shipment of office supplies. Each suffers lead poisoning from exposure to materials in the course of their work. According to Justice Lee, the painter has suffered an occupational disease and we must look to the ODA to determine the applicable compensation, but the office worker has suffered an injury by accident, which is to be evaluated under the WCA. The inequity of this result is manifest, and it is not called for by the text of the statutes. Justice Lee responds that his scheme "merely divides the two acts on a ground that turns on the mechanism of causation." *Infra* ¶ 180 n.7. But what textual basis is there for dividing the acts on that basis, where the WCA excludes "disease[s]" and the ODA covers "any disease"? Because the distinction between the schemes turns on whether the harm is a "disease," it would seem textually impermissible that two employees who suffer the same ailment be compensated under different acts. Yet Justice Lee's approach would mandate just that result. My approach does not simply "presume[] that the legislature divided the acts into categories of harm"; rather, it is my view that "give[s] effect to the legislative judgments expressed in the statute's text," where the text uses the word "disease" to divide the scope of the statutes. *Cf. infra* ¶ 180 n.7. It is Justice Lee who is forced to look beyond the text to explain why the same bodily condition is sometimes a disease, and sometimes not.

[45] *See* UTAH CODE § 34A-2-102(1)(j) (defining injury as "includ[ing] an injury caused by the willful act of a third person" but "not includ[ing] a disease, except as the disease results from the injury").

[46] *See id.* § 34A-3-103 (defining an occupational disease as "any disease").

art "occupational disease." I agree that "occupational disease" has historically been a technical term of art. I further agree that this term of art was grafted into the WCA in the past, as discussed more fully below. But I disagree as to the proper understanding of the term of art and that the legislature intended to incorporate Justice Himonas's understanding of "occupational disease"—an understanding based in pre-ODA caselaw—into either statute after the enactment of the ODA in 1941. I believe that the ODA is clear that the legislature has rejected the common law term of art understanding of "occupational disease." In addition, by amending the ODA in 1991 to eliminate specifically identified diseases from the definition of "occupational disease," the legislature jettisoned its previous statutory definitions of "occupational disease." As such, in place of our precedent's term of art understanding of "occupational disease" and its own previous statutory definitions of the term, the legislature has defined "occupational disease" to simply mean "any disease," a phrase that should be interpreted according to its plain meaning.

   a. *The language of the ODA contradicts a term of art understanding of "occupational disease"*

¶ 100 As Justice Himonas correctly articulates, when the legislature has "invoke[d] specialized legal terms that carry an extra-ordinary meaning[,] . . . we credit the legal term of art, not the common understanding of the words."[47] But there must be something in the statute or its history that "clearly show[s] that the language was used in a sense different from its natural and ordinary meaning."[48] Further, "when the construction of a section involves technical words and phrases which are defined by statute, the provision must be construed according to such peculiar and appropriate meaning or definition."[49] Thus, if the terms at issue are defined by statute in a way that differs from the term of art meaning, we cannot rely on the non-statutory

---

[47] *State v. Canton*, 2013 UT 44, ¶ 28, 308 P.3d 517.

[48] *Miles v. Wells*, 61 P. 534, 536 (Utah 1900).

[49] *Cannon v. McDonald*, 615 P.2d 1268, 1270 (Utah 1980).

understanding.[50] Ultimately, a statutory definition of a word or phrase trumps any differing term of art understanding. And as discussed below, there is no indication in the language of these statutes that the legislature intended to define the scopes of the two acts using the term of art understandings of "by accident" or "occupational disease" as suggested by Justice Himonas. Thus, we should employ our traditional plain language approach.

¶ 101 The WCA states that "'injury by accident arising out of and in the course of employment' does not include a *disease*."[51] Similarly, the ODA defines "a compensable occupational disease" as "any *disease*."[52] It is telling that in neither statute, either at present or at any point in the statutes' histories, did the legislature choose to use the actual term of art "occupational disease" to define either compensation act's scope.[53] To paraphrase another

---

[50] *See State v. Bagnes*, 2014 UT 4, ¶ 13, 322 P.3d 719 (looking first to whether a statutory term was defined by statute and, only after finding no such definition, determining that "[w]e must accordingly look elsewhere to derive its meaning—to either the ordinary meaning of the word, or to its technical sense as a legal term of art" (footnote omitted)).

[51] UTAH CODE § 34A-2-102(1)(j)(ii) (emphasis added).

[52] *Id.* § 34A-3-103 (emphasis added). Although the ODA continues by stating that the disease must "arise[] out of and in the course of employment and [be] medically caused or aggravated by that employment," these requirements go to the issue of whether a particular disease would be compensable, not whether a harm should be categorized at the first stage as either a disease or injury.

[53] The WCA, since its enactment in 1917, has only referenced "diseases." It was this court that interpreted that reference as "occupational disease." The ODA, although it has always provided compensation for "occupational diseases," has also always separately and specifically defined "occupational disease," either by reference to specific diseases or by using the general term "disease," thus showing no indication that the legislature intended to rely on the term of art understanding to define the ODA's scope. And we have never, until today, interpreted the

(cont.)

case in which we rejected reliance on a term of art definition to interpret a phrase that was not the term of art:

> Had the Legislature intended a restrictive meaning it could have used the term of art ["occupational disease"] in place of the term ["disease"]. Unlike the term ["disease,"] a restrictive reading of the term of art ["occupational disease"] is supported by several cases where the term ["occupational disease"] is distinguished from [other diseases and injuries] . . . . [54]

Although it may be true that "occupational disease" has a long history as being understood in a particular way in the caselaw of both this state and our sister states, that caselaw is irrelevant unless the legislature chooses to incorporate it.[55] And here there is no indication that "the language was used in a sense different from its natural and ordinary meaning."[56]

¶ 102   Justice Himonas fails to address this issue. He never explains what statutory language leads him to conclude that by specifically adopting the phrase "any disease" as the definition of "occupational disease," the legislature intended to adopt our term

---

general term "disease" as incorporating the term of art understanding of "occupational disease." Thus, at no point in the two acts' histories has the legislature relied on the term of art "occupational disease" to define the two acts' scopes.

[54] *MacFarlane v. Utah State Tax Comm'n*, 2006 UT 25, ¶ 15, 134 P.3d 1116 (bracketed words added in place of the phrases "income tax," a term of art, and "on income," a phrase that was interpreted to not incorporate the term of art understanding of "income tax").

[55] *See In re Estate of Hannifin*, 2013 UT 46, ¶ 20, 311 P.3d 1016 ("By enacting a Probate Code with a specific definition of 'child' that excludes those 'equitably' adopted, the legislature preempted common law doctrines that are in conflict with the results those definitions require.").

[56] *Miles*, 61 P. at 536.

of art understanding of "occupational disease."[57] The closest Justice Himonas comes to doing so is his focus on the causation language found in section 34A-3-103, which states that an occupational disease is compensable if it "arises out of and in the course of employment and is medically caused or aggravated by that employment." Justice Himonas reads this language to define an occupational disease as those harms that are "not unexpected" and that "do[] not typically arise from a definite event."[58] I believe this is a strained reading of the text for two reasons.

¶ 103 First, as with the WCA discussed above, the ODA's definition of "occupational disease" "assumes that the employee suffers from a 'disease' and focuses on whether the disease is

---

[57] Justice Lee agrees with Justice Himonas's view that the 1991 Utah legislature intended to adopt the pre-ODA term of art understanding of "occupational disease" in amending the ODA. *Infra* ¶¶ 178, 189. Accordingly, Justice Lee's arguments overlap with Justice Himonas's in their inability to explain why the legislature—after rejecting the common law term of art understanding of "occupational disease" through the enactment of the 1941 ODA—would decide, fifty years later, to adopt that term of art understanding. Contrary to Justice Lee's contention, the common law understanding of "occupational disease" did not "remain[] unaltered for many decades," and it certainly never became "deeply embedded in our law." *Infra* ¶¶ 190–91. Rather, the legislature rejected our court's pre-ODA understanding of "occupational disease" in 1941, and that previous understanding has been lying abandoned ever since. Justice Lee offers no explanation for why, in using the phrase "any disease" in the 1991 ODA amendments, the legislature intended to revive an interpretation of the term "occupational disease" that had been displaced fifty years earlier. Instead, he, like Justice Himonas, conflates a statutory causation requirement—that the disease or injury to health "can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment"—as being a limit on the scope of harms that are to be assessed under the ODA, rather than simply a limit on what is *compensable* under the ODA. *See infra* ¶ 189.

[58] *Supra* ¶ 42.

causally connected to workplace conditions."[59] The statutory definition requires "threshold proof of disease" as a "prerequisite to recovery."[60] Thus, the language of causation provides no insight as to what constitutes a disease, as it only tells us when a harm that has already been categorized as a "disease" is compensable. Once again, relying on the language of causation conflates the threshold inquiry of categorization with the secondary inquiry of compensability.

¶ 104    Second, even if we are to assume that this causation language helps describe the statute's scope, the language is in large part repeated in the WCA to describe a compensable injury.[61] I see no basis to interpret the "arising out of" language in the ODA as importing notions of an expected gradually occurring condition while refusing to interpret the nearly identical language of causation in the WCA to do the same. This contradicts our normal approach of interpreting the same language in two closely related statutes similarly.[62]

---

[59] *Duvall*, 621 N.E.2d at 1125.

[60] *See Noble*, 512 N.W.2d at 294 ("[T]he statutory criteria upon which [the claimant] relies *presume* the existence of a *disease*. The factors cited relate solely to proof of causation. Were threshold proof of disease not a prerequisite to recovery under [the ODA], many disabilities arising from clearly traumatic injuries would also meet [the ODA's] requirements. Such a circumstance would contravene the clear intent of [the WCA and ODA] to make recovery under the two chapters mutually exclusive." (citation omitted)).

[61] *See* UTAH CODE § 34A-2-401(1) (providing compensation to any "employee . . . who is injured . . . by accident *arising out of and in the course of the employee's employment*" (emphasis added)).

[62] *See Spring Canyon Coal Co. v. Indus. Comm'n*, 277 P. 206, 211 (Utah 1929) ("[T]he same meaning will be given to a word or phrase used in different parts of a statute."); *see also State v. MacGuire*, 2004 UT 4, ¶ 15, 84 P.3d 1171 ("[T]he plain language of a statute is to be read as a whole, and its provisions interpreted in harmony with other provisions in the same statute and with other statutes under the same and related chapters." (citation omitted));

(cont.)

¶ 105   So although Justice Himonas criticizes my approach for looking to the plain meaning of "injury,"[63] I believe he has failed to explain why our usual tools of statutory interpretation are inadequate. Justice Himonas never explains why we must assume that when the legislature said "any disease," it really meant to say "occupational disease."[64] To be sure, as I have acknowledged, the legislature has instructed us to interpret "technical words and phrases, and such others as have acquired a peculiar and appropriate meaning in law, or are defined by statute, . . . according to such peculiar and appropriate meaning or definition."[65] But the term "any disease" has not acquired a term of art understanding.

¶ 106   Indeed, by using the phrase "any disease" to define "occupational disease," the legislature has specifically adopted a definition that directly contradicts the understanding in our caselaw. As Justice Himonas states, our caselaw created a term of art definition of "occupational disease," defining the term as a

---

*Masich v. U.S. Smelting, Ref. & Mining Co.*, 191 P.2d 612, 619 (Utah 1948) ("In passing to Section 42–1a–3, the Occupational Disease Statute, attention is again directed to the fact that the wording used by the legislature is exactly the same as the wording used in the Accidental Injury Act, Section 42–1–57. This court, prior to the enactment of the Occupational Disease Statute, having construed the provisions of the Compensation Act to have abrogated the common law rights of employees, we see no reason to place a different interpretation on the same provision of the Occupational Disease Act unless the legislature by clear and unmistakable language has indicated a contrary interpretation. We find no such language in the statutes.").

[63] *Supra* ¶¶ 47–50.

[64] "[Justice Himonas's] interpretation of the term 'disease,' as used in [section 34A-3-103], gives it the same meaning as the term 'occupational disease' as generally used in our case law. [Justice Himonas] is essentially defining the term 'occupational disease,' as used in [the ODA], by using the term 'occupational disease.'" *Weyerhaeuser*, 998 P.2d at 232 (Deits, C.J., dissenting).

[65] UTAH CODE § 68-3-11.

"gradually developing condition[]."[66] But the current statutory definition of "occupational disease," adopted in 1991, is simply "any disease or illness." There is no indication in the statute that by "any disease," the legislature intended "any gradually occurring disease." Indeed, such a reading requires us to ignore the statutory definition and interpret the statutes to contradict their plain meaning, which we cannot do.[67]

¶ 107   Ultimately, I see nothing in the language of either statute that reveals a legislative intent to define the statutes' scopes by incorporation of the common law understanding of the term of art "occupational disease." Because we presume that the legislature is aware of legal terms and their meanings, it is wholly inappropriate for us to "re-engraft[] by judicial decision" a term of art meaning that the legislature has deliberately excluded.[68] Accordingly, because the legislature has not revealed an intent to adopt the common law understanding of "occupational disease," and has instead required that we define the term as "any disease," we should interpret the term "disease" using our traditional approach to statutory interpretation and rely on the ordinary

---

[66] *Supra* ¶ 36 (quoting *Carling v. Indus. Comm'n*, 399 P.2d 202, 203 (Utah 1965)).

[67] *See O'Keefe v. Utah State Ret. Bd.*, 956 P.2d 279, 281 (Utah 1998) ("A fundamental rule of statutory construction is that statutes are to be construed according to their plain language. . . . Furthermore, unambiguous language may not be interpreted to contradict its plain meaning.").

[68] *Christensen v. Christensen (In re Estate of Christensen)*, 655 P.2d 646, 649 (Utah 1982) ("Even though 'contemplation of marriage' figured prominently in prior statutes and case law, the Uniform Probate Code makes no mention of that legal requirement. In a statute so carefully drafted, that omission must have been deliberate. We think it would therefore be inappropriate for the 'contemplation of marriage' requirement to be re-engrafted by judicial decision.").

meaning of the terms.[69] This approach is only confirmed as we look to the history of the ODA.

 *b. The history of the ODA shows that a term of art approach was not intended by the legislature*

¶ 108 Justice Himonas states that my approach creates a sea change in the way we distinguish between the harms covered by the WCA and those covered by the ODA, essentially overruling decades of caselaw interpreting these statutes. I believe that my framework correctly recognizes that "occupational disease" was a term of art that had been given specific meanings over time by the legislature. It is the legislature's prerogative to change the definition of "occupational disease," and its choice to do just that in 1991 effected the sea change in workers' compensation in Utah.

¶ 109 As I discuss below, our caselaw correctly interpreted the WCA to incorporate the term of art "occupational disease." Since that time, however, our muddled caselaw has generally failed to recognize the impact of the legislature's choice to define and redefine that term of art through the years. The scope of the WCA has not changed over time—it has always covered "injuries," and has never covered "diseases." What has changed is the scope of the statutorily mandated carve-out of "diseases."

---

[69] Justice Lee argues that the legislature's intent to adopt the common law understanding of "occupational disease" can be inferred from its "circular" definition of "occupational disease" as "any disease." *Infra* ¶ 188. According to this argument, this circularity "emphasizes that the legislature is 'convey[ing] its acceptance of a term of art with a widely shared meaning.'" *Infra* ¶ 188 (quoting *Hughes Gen. Contractors, Inc. v. Utah Labor Comm'n*, 2014 UT 3, ¶ 14, 322 P.3d 712). But as I have discussed, Justice Lee, like Justice Himonas, relies on the definition of "occupational disease" contained in caselaw that predated the 1941 ODA, *see infra* ¶ 189 (quoting *Young v. Salt Lake City*, 90 P.2d 174 (Utah 1939)—a definition that was expressly rejected by the original 1941 ODA. This alleged circularity therefore provides no indication that the legislature intended to adopt the common law definition of occupational disease that it had rejected in 1941 and continued to reject in the intervening years.

That carve-out depends on the definition of "occupational disease," which was first defined by this court and then defined and redefined by the legislature in the ODA. Thus, any change to the definition of "occupational disease" by the legislature—such as the 1991 amendment to the ODA—necessarily requires a change in how compensation cases are decided.

¶ 110    Therefore, our prior precedent, which interpreted prior versions of the statutes, has been rendered irrelevant by the legislature's decision to change a fundamental aspect of the statutes—the definition of a key term that determines the scopes of the two statutory schemes. In addition, previous versions of the ODA, which have given different definitions for the term "occupational disease," have likewise been rendered irrelevant. Thus, we should not focus on defunct precedent or versions of the ODA rendered inoperative by the legislature, but on the plain language of the current version of the ODA.

¶ 111    The history of the ODA begins with the WCA. When the WCA was first passed in 1917, it contained the same exclusion of "diseases" that is at issue in this case.[70] Our first few cases dealing with the scope of the WCA struggled to understand what, exactly, the legislature intended by this exclusion. We found it clear that "occupational diseases"—a term of art consistent with Justice Himonas's definition of disease—were excluded.[71] We noted that other courts had interpreted similar statutory schemes that excluded "diseases" as an exclusion of "occupational diseases."[72] We concluded that "[s]uch obviously was also the purpose of the Legislature of this state when disease was excluded in the definition of injury by accident."[73] After we

---

[70] *See* COMPILED LAWS OF UTAH § 1-49-3112(5) (1917).

[71] *See, e.g., Pinyon Queen Mining Co.*, 204 P. at 326; *Young*, 90 P.2d at 175–76.

[72] *See Pinyon Queen Mining Co.*, 204 P. at 326 ("The [Iowa] court held that the manifest design of the General Assembly in providing that the term 'personal injuries' should not include a disease was to eliminate occupational diseases.").

[73] *Id.*

concluded that the exclusion of "disease" in the WCA covered at least "occupational diseases," there still remained the question of whether other diseases, those not classified as "occupational diseases" but still contracted in the course of employment, were also excluded from the WCA.[74] Our cases contained contrary language,[75] and the issue was not resolved until 1940.

¶ 112   In *Andreason v. Industrial Commission*, Mr. Andreason, who worked for the Colorado By-Products Company "skinning and butchering animals," died from an "uncommon" disease "acquired from contact with diseased animals or diseased meat."[76] We had to decide whether Mr. Andreason's "non-occupational" disease was covered by the WCA. Although we recognized that the language of the statute suggested "that, unless infection set in through some wound or abrasion in the skin acquired in the course of one's employment, the resultant disease could not be considered an accidental injury,"[77] we held that, based on "the absurdity of making compensation depend[]"[78] on whether the

---

[74] *See Chase v. Indus. Comm'n*, 17 P.2d 205, 208 (Utah 1932) ("[T]he question of whether a disease contracted in the course of employment is or is not compensable . . . . is an open one in this jurisdiction.").

[75] *Compare id.* ("The words . . . '[personal injury by accident] shall not include a disease except as it shall result from the injury' would seem to indicate a legislative intent that the contraction of a disease to be compensable must be brought about by some injury other than merely conveying disease germs to the employee." (second alteration in original)), *with Pinyon Queen Mining Co.*, 204 P. at 326 (stating that "the purpose of the Legislature of this state" in excluding "disease" from "the definition of injury by accident" "was to eliminate occupational diseases"), *and Young*, 90 P.2d at 176 ("A disease contracted as a direct result of unusual conditions connected with the work, and not as an ordinary or reasonably to be anticipated result of pursuing the work, is to be considered an accidental injury." (citation omitted)).

[76] 100 P.2d 202, 203–04 (Utah 1940) [*Andreason I*].

[77] *Id.* at 205.

[78] *Id.* at 205–06.

disease was the result or cause of an injury,[79] "a disease may be an accidental injury" and thus compensable under the WCA.[80] Thus we settled that the WCA's exclusion of "disease" meant "occupational disease" and only "occupational disease." And, at the time, there was no statutory definition of "occupational disease," which led us to define "occupational disease" according to the common law understanding of the term: "a diseased condition arising gradually from the character of the employee's work."[81]

¶ 113 Justice Himonas and I agree that we properly interpreted "disease" in the WCA to mean "occupational disease." We also agree that, at least at the time, "occupational disease" was to be understood by its common law term of art meaning. Where I ultimately believe that Justice Himonas's analysis comes up short is that he has failed to recognize that the common law term of art understanding of "occupational disease" that we adopted in these early cases was superseded by the legislature's enactment of the ODA in 1941, and that the legislature, in 1991, rejected any prior technical or statutory understanding of "occupational disease."

¶ 114 When *Andreason I* was decided, there was no statutory definition of "occupational disease," so we relied on our judgment and other jurisdictions' caselaw to define it as a "gradually developing condition."[82] The very next year, in 1941, the legislature enacted the ODA, which defined "occupational disease" as a specific list of twenty-seven ailments. In doing so, the legislature did not alter the WCA's exclusion of "diseases." "[W]here a legislature amends a portion of a statute but leaves other portions unamended, or re-enacts them without change, the

---

[79] As the dissent in *Andreason I* described, a disease is compensable under the statute if it results from an injury, but not if the injury results from a disease. *See id.* at 206–07 (McDonough, J., dissenting).

[80] *Andreason v. Indus. Comm'n*, 102 P.2d 894, 895 (Utah 1940) [*Andreason II*] (denying petition for rehearing).

[81] *Young*, 90 P.2d at 176 (citation omitted).

[82] *See Carling*, 399 P.2d at 203; *Young*, 90 P.2d at 175–77.

legislature is presumed to have been satisfied with prior judicial constructions of the unchanged portions of the statute and to have adopted them as consistent with its own intent."[83] Accordingly, we must presume that the legislature was both aware and approved of our interpretation of "disease" as used in the WCA to mean "occupational disease."[84]

¶ 115   It is only logical, then, that by enacting the ODA and including within it a specific definition of an "occupational disease," the legislature intended to replace our definition of that term with its own. There was no indication at that time—and there remains no indication today—that the understanding of "occupational disease" incorporated into the WCA should be any different than the definition of "occupational disease" found in the ODA.[85] I believe that by enacting the ODA in 1941 with a specific definition of "occupational disease," the legislature superseded the common law understanding of "occupational disease" with its own specific definition of that term of art.

¶ 116   This is made clear as we review the different versions of the ODA. The original version of the ODA enacted in 1941 defined an "occupational disease" in section 28 of that Act as twenty-seven specifically enumerated diseases, many of which

---

[83] *Christensen*, 642 P.2d at 756.

[84] It is true, as Justice Himonas notes, that the legislature never defined "disease." *Supra* ¶ 49. But as I explain, by not amending the WCA after our construction that the word "disease" in the WCA means "occupational disease," the legislature can be presumed to have embraced that interpretation. So when the legislature subsequently included a definition of "occupational disease" in the 1941 ODA as a specific list of twenty-seven enumerated conditions, it was also necessarily defining the scope of the word "disease" in the WCA to mean only that list of conditions.

[85] *See Grayson Roper Ltd. P'ship v. Finlinson*, 782 P.2d 467, 471–72 (Utah 1989) ("[S]eparate parts of an act should not be construed in isolation from the rest of the act and the terms of related code provisions should be construed in a harmonious fashion." (citation omitted)).

were diseases caused by poisoning from various compounds.[86] Clearly, such a highly specific and narrow definition of "occupational disease" did not invoke our pre-ODA caselaw's term of art understanding of "occupational disease." Further, the diseases listed in the ODA as defining "occupational disease" did not match the common law understanding of "occupational disease." For example, the ODA covered poisoning by both cyanide and chlorine.[87] The harm resulting from either could occur suddenly or develop gradually, depending on the extent of exposure.[88] Among the non-poisoning conditions covered by the Act were anthrax and silicosis. Anthrax has rapid harmful effects,[89] while silicosis can have either abrupt or more gradual effects.[90] None of these conditions can be reasonably said to be categorized as a disease by the legislature based upon whether their onset was sudden or gradual, or whether they were expected or unexpected. In fact, as described below, the legislature specifically excluded consideration of whether a disease was expected when determining whether an occupational disease was

---

[86] 1941 Utah Laws 79.

[87] *See id.* at 83.

[88] *See Facts About Cyanide*, CENTERS FOR DISEASE CONTROL & PREVENTION, https://emergency.cdc.gov/agent/cyanide/basics/facts.asp (last visited July 21, 2017); *Facts About Chlorine*, CENTERS FOR DISEASE CONTROL & PREVENTION, https://emergency.cdc.gov/agent/chlorine/basics/facts.asp (last visited July 21, 2017).

[89] *See Type of Anthrax*, CENTERS FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/anthrax/basics/types/index.html (last visited July 21, 2017).

[90] Acute silicosis can potentially arise after exposure to a single or limited number of extremely high concentrations of silica, while chronic silicosis "occurs after 15–20 years of moderate to low exposures to respirable crystalline silica." *See* Fact Sheet, Crystalline Silica Exposure Health Hazard Information, OCCUPATIONAL SAFETY & HEALTH ADMIN. (2002), https://www.osha.gov/OshDoc/data_General_Facts/crystalline-factsheet.pdf.

compensable. Thus, the legislature had unmistakably supplanted the common law understanding of "occupational disease" with its own definition.

¶ 117  It is worth noting that in two other separate sections of the original ODA, 13 and 27, the legislature made compensation depend on whether the employee became totally disabled[91] and whether there was a sufficient causal connection between the work and the disease.[92] So the compensability requirements—i.e., causation—were considered separate and distinct from the definition of "occupational disease," meaning the legislature did not intend for causation to operate as the definition of "occupational disease." But even if the causation language is treated as part of the definition of "occupational disease"—as Justice Himonas's approach requires—the statute's discussion of causation contained no language referencing a "gradually occurring condition" and expressly rejected consideration of "expectedness" by stating that "[t]he disease need not have been foreseen or expected."[93] Thus, no matter which way you approach

---

[91] 1941 Utah Laws 83–84 (imposing "upon every employer a liability for the payment of compensation to every employee who becomes totally disabled by reason of an occupational disease" and defining the twenty-seven occupational diseases).

[92] *See id.* at 83 ("The occupational diseases hereinafter defined shall be deemed to arise out of the employment, only if there is a direct causal connection between the conditions under which the work is performed and the occupational disease, and which can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment, and which can be fairly traced to the employment as the proximate cause, and which does not come from a hazard to which workmen would have been equally exposed outside of the employment. The disease must be incidental to the character of the business and not independent of the relation of employer and employee. The disease need not have been foreseen or expected but after its contraction it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a natural consequence.").

[93] *Id.*

the issue, the original version of the ODA rejected the common law term of art understanding of "occupational disease."

¶ 118 The legislature then amended the ODA in 1949[94] to cover the same twenty-seven diseases as well as a catch-all for "other diseases or injuries to health."[95] The statute stated that these other diseases "shall be compensable only in those instances where it is shown" that they "directly ar[o]se as a natural incident of the exposure occasioned by the employment," which required the claimant to satisfy six separate elements, each of which related to causation.[96] Justice Himonas contends that "the 1991 amendment to the Occupational Disease Act served primarily to simplify the Act and is closely aligned to the 1949 version," which he argues incorporated the common law term of art meaning of "occupational disease."[97]

¶ 119 But the 1991 amendments make no reference to the prior six-part test that was part of the 1949 definition of "occupational disease." The 1991 amendments also eliminate reference to the twenty-seven specifically enumerated diseases, instead defining "occupational disease" to mean "any disease or illness."[98] In making these changes, the legislature gave no indication that it intended to use either the common law term of art meaning of "occupational disease" or its own prior definitions of that term.[99] The practical effect of the legislature's failure to

---

[94] This version of the statute would last until the 1991 amendments, which are at issue today.

[95] UTAH CODE § 35-2-27(28) (1953).

[96] *See id.*

[97] *Supra* ¶ 49.

[98] UTAH CODE § 34A-3-103.

[99] Justice Himonas argues that the legislative history of the 1991 amendments does not reveal "an intention to discard the term of art approach." *Supra* ¶ 52. But that is not the right question. The first question we must ask is whether we can find legislative *intent to incorporate* a special meaning, before we can ask whether there is evidence of *intent to discard* one. But even if we were to begin the search by looking for an intent to reject the

(cont.)

adopt the term of art meaning in 1941, 1949, and 1991 is that we must engage in a plain language analysis to determine what constitutes a "disease" under the ODA.[100] A plain meaning analysis is the first tool in our statutory interpretation toolbox, and there is little reason to believe the legislature would assume that we would ignore it here.

¶ 120 The current version of the ODA provides an incomplete definition for "disease," defining the term solely in terms of causation while presupposing the existence of a "disease." This incomplete definition requires us to employ our usual tools of statutory interpretation to define "disease," beginning with a plain language approach. And because there is no indication in the language of the 1991 ODA (or, as discussed above, of the 1949 ODA) of any legislative intent to adopt our caselaw's term of art understanding of "occupational disease," there is no indication that the legislature ever intended a meaning of "disease" that differed from the ordinary meaning of that term. In summary, previous statutory and caselaw definitions of

---

common law term of art meaning, as I have explained, we can easily find that intent in the *text* of the 1941 ODA. *See supra* ¶ 117 & nn.91–93 (explaining that the 1941 ODA expressly stated that "[t]he disease need not have been foreseen or expected"). Because the legislature had so long ago rejected the common law understanding of this term, the presence or absence of an intent to discard that understanding in the 1991 legislative history is simply irrelevant. It really should come as no surprise that the legislature expressed no such intent to discard, because it had no occasion to do so.

[100] Because the legislature never indicated an intent to adopt our common law understanding with any of these iterations of the statute, my approach is not, as Justice Himonas asserts, "ultimately moored to the 1991 amendments" to the ODA. *Supra* ¶ 46 n.16. My point is that for us to properly elevate the term "occupational disease" to a term of art and give it the particular meaning it had acquired in our caselaw before 1941, there must be some legislative indication to incorporate that special meaning. And I simply cannot see any, and neither Justice Himonas nor Justice Lee identifies any.

"occupational disease" were rendered inoperable by the 1991 ODA.

¶ 121  Further, even if Justice Himonas is correct that the causation language should be read as defining "occupational disease," a point I disagree with, then the legislature's rejection of the common law term of art understanding of "occupational disease" is even more apparent. The legislature created a highly specific six-part test for causation that was taken nearly word for word from the causation requirements found in the original version of the ODA enacted in 1941. These requirements, as discussed above, contained no language referencing a "gradually occurring condition" and expressly rejected consideration of "expectedness" by stating that the disease "need not have been foreseen or expected."[101] So even using Justice Himonas's reliance on the language of causation to define the scope of the ODA, I can only conclude that the legislature again rejected the pre-ODA common law term of art understanding of "occupational disease."

¶ 122  Ultimately, I see no legislative intent to codify the pre-ODA term of art meaning of "occupational disease" in either of the prior iterations of the ODA. The legislature's enumeration of certain diseases and later provision of a catch-all did not encompass the common law term of art understanding espoused by Justice Himonas. In fact, under Justice Himonas's logic, the legislature's discussion of causation directly and specifically excluded incorporation of the term of art. The legislature's rejection of the common law term of art has only continued in the current version, when in 1991 it scrapped the twenty-seven conditions and the more general catch-all. By simply defining "occupational disease" as "any disease or illness," it again rejected any technical definition of "occupational disease." Previous iterations of the ODA and our precedent are no longer good law. The legislature discarded those approaches to compensation for occupational diseases. We should thus look solely to the plain language of the current version of the ODA when applying its provisions. For the reasons discussed above, I believe that the term "disease" as used in both the ODA and WCA should not be viewed as having incorporated the term of art understanding of

---

[101] UTAH CODE § 35-2-27(28) (1953).

"occupational disease." Because the legislature superseded the common law understanding of "occupational disease" by adopting a statutory definition of the term, our cases that relied on that common law understanding are no longer viable, and we should no longer rely on cases interpreting prior versions of the statutes.[102] No term of art understanding should apply when the legislature has specifically defined the term. And the 1991 amendments to the ODA make clear that the legislature has rejected any prior technical or statutory understanding of "occupational disease." Now, it simply means "disease." Without a more technical or statutory definition of the term "occupational disease," what we are left with is the plain meaning.

¶ 123 Justice Himonas argues that my approach "has the perverse implication" of "narrowing" the definition of "occupational disease," because my approach would, according to Justice Himonas, exclude bursitis—a condition specifically listed in previous versions of the ODA.[103] Even if my approach were to have the effect of eliminating bursitis from the ODA, there is

_____

[102] I admit that Justice Himonas's approach better aligns with our caselaw, but I believe that that the legislature's intent, as expressed in its amendment to the text of the statute, supersedes our prior cases and renders them wholly irrelevant. The scope of the WCA has always depended on the statutory exclusion of "disease." The legislature has no duty to comport with our precedent defining that term and is free to redefine it as it deems appropriate. As part of our duty to adhere to the legislature's intent, we read and interpret statutes in harmony with each other, especially when they are as intertwined as the WCA and ODA. An interpretation of the ODA—including the legislature's most recent amendments thereto—necessarily implicates an interpretation of the WCA, because the ODA's definition of "occupational disease" determines what constitutes a "disease" for purposes of the WCA. So a change to the ODA may require a change to our understanding of the WCA. This is what I believe happened with the 1991 ODA amendments. Our best tool for performing the work of following the legislature's intent, especially in this context, is a plain language approach.

[103] *Supra* ¶ 54.

nothing "perverse" about removing from the scope of the ODA a condition that is not, according to common understanding, a "disease." The elimination of bursitis from the ODA is the result of the legislature's decision to jettison bursitis, along with the other specifically enumerated harms found in prior versions of the ODA. Contrary to Justice Himonas's suggestion, nothing indicates that bursitis is a "core disease."[104] Simply because the legislature chose to define "occupational disease" to include bursitis in a prior version of the ODA does not mean that it is a "core disease." In fact, a more logical inference to draw from the legislature's decision to jettison the list—bursitis included—is that upon further consideration it may not have considered all of the items on that list to be occupational diseases.

¶ 124   To summarize my discussion of the WCA and ODA, the terms of the WCA and ODA require us to distinguish between "injuries" and "disease," an approach that aligns with the course taken by other states.[105] And whether a harm is an "injury" or "disease" is a threshold inquiry as to which statute applies. The phrase "by accident"—a term of art that has specific meaning in the context of workers' compensation schemes—does not define what an "injury" is and thus does not guide us in determining the scope of the WCA. Instead, it only informs us as to whether a harm categorized as an "injury" is compensable. Relatedly, the common law term of art understanding of "occupational disease" has long been superseded by the legislature, has no basis in the language of any version of the ODA, and thus has no relevance to the issue we decide today, leaving us with only the term "disease." And we should not define that term by looking to previous versions of the ODA. By enacting the 1991 ODA, the legislature continued to reject our common law term of art definition of "disease" and also jettisoned its own effort to define that term by enumerating twenty-seven specific diseases covered

---

[104] *Supra* ¶ 54.

[105] *See, e.g.*, *Luttrell*, 507 N.E.2d at 541–42 (using a plain language approach to describe how "'injury' is distinguished from a 'disease'" for purposes of statutory schemes similar to Utah's); *Duvall*, 621 N.E.2d at 1124–26 (same); *Noble*, 512 N.W.2d at 294–95 (same); *Pee*, 543 S.E.2d at 234–37 (same).

under the Act. Now, we should, as with any other statute, focus on the plain language of the current version of the ODA.

¶ 125   Justice Himonas's focus on these terms of art stems from his reliance on cases that either pre-date the ODA or failed to consider the legislative intent in enacting a specific definition of "occupational disease." His attempt to reconcile this caselaw, while understandable, is in my opinion misplaced in light of the legislature's amendment to the ODA. We simply cannot look to past cases' interpretations of the ODA or the WCA to understand what the legislature intended by redefining the fundamentally key term "occupational disease" when the legislature has, by the plain language of the statute, repudiated those cases' interpretations.

¶ 126   Thus, in my view, it is neither the timing of the harm, nor its unexpectedness—factors derived from the common law term of art understandings of "accident" and "occupational disease"—that determine whether a harm is an injury or a disease. We should not focus on our prior caselaw's discussion of what constitutes an "accident" in order to describe how an "accident" differs from an "occupational disease," because those terms of art are not relevant to the threshold question of which compensation scheme applies and only confuse the issue we must decide. Instead, we should focus on the terms that define the statutes' scopes, "injury" and "disease," and interpret them according to their ordinary meaning.

## II. The Plain Language of the Statutes Provides Clear Guidelines and Requires that We Categorize Ms. Rueda's Harm as an "Injury"

¶ 127   As noted above, in employing a plain language approach to the threshold question of how we distinguish a "disease" from an "injury," I would join the majority of states that have addressed this issue. Four states, Illinois,[106] Indiana,[107]

---

[106] *See Luttrell v. Indus. Comm'n*, 507 N.E.2d 533, 541–42 (Ill. App. Ct. 1987).

[107] *See Duvall v. ICI Ams., Inc.*, 621 N.E.2d 1122, 1124–26 (Ind. Ct. App. 1993).

Iowa,[108] and South Carolina,[109] used a plain language approach to determine the difference between an "injury" and a "disease." Each court recognized that an "injury" is commonly understood as related to or synonymous with "trauma."[110] They noted that "none of the commonly understood meanings for the word 'disease' trace the cause of disease to a trauma"[111] and concluded "that a disease is commonly understood to result when the body is invaded by outside agents such as bacteria, virus, poison, toxin, or germs."[112] Thus, as the Illinois court stated:

> In this regard, it is quite generally recognized that an "injury" is distinguished from a "disease" by virtue of the fact that an injury has its origin in a specific, identifiable trauma or physical occurrence or, in the case of repetitive trauma, a series of such occurrences. A disease, on the other hand, originates

---

[108] *See Noble v. Lamoni Prods.*, 512 N.W.2d 290, 294–95 (Iowa 1994).

[109] *See Pee v. AVM, Inc.*, 543 S.E.2d 232, 234–37 (S.C. Ct. App. 2001), *aff'd*, 573 S.E.2d 785 (S.C. 2002).

[110] *See Luttrell*, 507 N.E.2d at 541–42 ("[I]t is quite generally recognized that an 'injury' is distinguished from a 'disease' by virtue of the fact that an injury has its origin in a specific, identifiable trauma or physical occurrence or, in the case of repetitive trauma, a series of such occurrences."); *Duvall*, 621 N.E.2d at 1126 ("Thus, by definition, the term trauma is synonymous with injury, and the cumulative effect of more than one trauma is likewise an injury."); *Noble*, 512 N.W.2d at 295 (agreeing that an injury results from "external traumatic forces"); *Pee*, 543 S.E.2d at 235–36 (agreeing with other courts that injury is synonymous with trauma).

[111] *Pee*, 543 S.E.2d at 235; *see also Noble*, 512 N.W.2d at 295.

[112] *Noble*, 512 N.W.2d at 294–95; *see also Luttrell*, 507 N.E.2d at 542 ("A disease, on the other hand, originates from a source that is neither traumatic nor physical . . . ."); *Duvall*, 621 N.E.2d at 1125 (holding that an occupational disease results from "exposure to workplace conditions").

> from a source that is neither traumatic nor physical . . . .[113]

Each of the courts relied on this plain language approach to conclude that carpal tunnel syndrome, a condition not unlike Ms. Rueda's in that it stems from repetitive stress or trauma over a long period of time, could not be classified as a disease, but was rather an injury for purposes of compensation.

¶ 128   I believe that these courts' analysis is persuasive, as it comports with my own review of dictionary definitions of the terms "injury" and "disease," and should be adopted in Utah. As we have often noted, dictionary definitions are helpful as a starting point in describing the range of meanings a term may have.[114] Of course, this range of dictionary meanings is not conclusive in and of itself as it "often fail[s] to dictate 'what meaning a word *must* bear in a particular context,'" thus requiring us to "select[] the best meaning among a range of options, based on other indicators of meaning."[115]

¶ 129   "Injury" is defined broadly, encompassing all harm or damage,[116] and is closely related to "trauma."[117] Thus, an "injury"

---

[113] *Luttrell*, 507 N.E.2d at 541–42.

[114] *State v. Canton*, 2013 UT 44, ¶ 13, 308 P.3d 517.

[115] *Id.* (citations omitted).

[116] *See Injury*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011) ("Damage or harm done to or suffered by a person or thing"); *Injury*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/injury (last visited July 21, 2017) ("hurt, damage, or loss sustained").

[117] *See Trauma*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011) ("Serious injury to the body, as from physical violence or an accident"); *Trauma*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/trauma (last visited July 21, 2017) ("an injury (such as a wound) to living tissue caused by an extrinsic agent"); *Trauma*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1961) ("an injury or wound to a living body caused by the application of external force or violence").

is a condition that results from physical trauma.[118] The word "disease" has both a broad and a more narrow definition. Its broad definition suggests that any abnormal or injurious condition would qualify as a disease.[119] Its more narrow definition focuses on conditions resulting not from trauma, but from other sources, such as exposure to environmental hazards (e.g., poisons, toxins, or radiation), the invasion of foreign infectious agents (e.g., bacteria or viruses), or inherent biological or genetic defects.[120]

---

[118] This definition of "injury" is sufficiently broad to capture a category of harms—referred to as "internal failures"—that our precedent has consistently treated as falling within the WCA's scope, so long as these failures are coupled with an identifiable physical trauma. *See Allen v. Indus. Comm'n*, 729 P.2d 15, 18 n.3 (Utah 1986); *cf. infra* ¶ 195. These harms, which include "heart attacks, hernias, and back injuries," constitute injuries if they result from identifiable physical trauma acting upon the body.

[119] *See Disease*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/disease (last visited Aug. 11, 2017) ("[A] condition of the living animal or plant body or one of its parts that impairs normal functioning and is typically manifested by distinguishing signs and symptoms[.]"); *Disease*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("[s]pecial classes of pathological conditions with similar traits, such as having similar causes and affecting similar organs").

[120] *See Disease*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011) ("An abnormal condition of a part, organ, or system of an organism resulting from various causes, such as infection, inflammation, environmental factors, or genetic defect, and characterized by an identifiable group of signs, symptoms, or both."); *Disease*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1961) ("an impairment of the normal state of the living animal or plant body or of any of its components that interrupts or modifies the performance of the vital functions, being a response to environmental factors (as malnutrition, industrial hazards, or climate), to specific infective agents (as worms, bacteria, or viruses), to inherent defects of the organism (as various genetic anomalies), or to combinations of these factors"); *Disease*, DICTIONARY.COM,

(cont.)

Within the context of the WCA and ODA, it is clear that the more narrow definition of "disease" was intended by the legislature.

¶ 130   Because the definition of "injury" is broad, with no narrower understanding of the term than "damage or harm," a broad definition of "disease" would lead to substantial overlap between the statutes. And as the ODA was and is intended to cover the subset of harms not already covered by the WCA, the legislature would not have intended "disease" to be understood as essentially synonymous with "injury." Thus, I agree with the courts discussed above that a "disease" is to be understood narrowly, not as those conditions that result from physical trauma or force, but rather those that would ordinarily be understood as a disease, which often result from exposure to environmental hazards and foreign agents, such as bacteria, viruses, other germs, poisons, and toxins, or from inherent biological or genetic defects.[121] An injury would be those harms experienced as a result of trauma, whether the trauma occurs all at once or over time.

_____

http://www.dictionary.com/browse/disease (last visited Aug. 11, 2017) ("1. a disordered or incorrectly functioning organ, part, structure, or system of the body resulting from the effect of genetic or developmental errors, infection, poisons, nutritional deficiency or imbalance, toxicity, or unfavorable environmental factors; illness; sickness; ailment. 2. any abnormal condition in a plant that interferes with its vital physiological processes, caused by pathogenic microorganisms, parasites, unfavorable environmental, genetic, or nutritional factors, etc.").

[121] The ODA's recognition that compensation is available for "[p]hysical, mental, or emotional diseases *related to mental stress* arising out of and in the course of employment" does not contradict my proposed understanding of disease. UTAH CODE § 34A-3-106(1) (emphasis added). *Cf. infra* ¶ 181. Mental and emotional diseases can easily be viewed as falling within the larger category of all diseases, because they are understood in common usage to be "diseases," and because they share the common trait of having an origin not based in physical trauma. It is thus completely consistent with my view that the legislature chose to include within the scope of the ODA mental and emotional diseases alongside other ailments that similarly do not

(cont.)

¶ 131 It is worth emphasizing that in none of the understandings of "injury" or "disease" discussed above is the unexpectedness of a harm or the time a harm takes to manifest a defining feature. Indeed, the common understanding of "disease" is that it can occur by sudden onset, or it can develop gradually. So too with an injury. And a disease may be every bit as unexpected as an injury. As discussed above, the original version of the ODA defined "occupational disease" by listing specific ailments that both would be commonly understood as diseases and could occur gradually or suddenly, expectedly or unexpectedly. Thus, the distinction between "injuries" and "diseases" cannot be based on the expectedness of the harm, the discreteness of incidents giving rise to the harm, or the time it takes for a harm to emerge.

¶ 132 So in my view, our threshold inquiry should focus on whether the ultimate harm at issue is an injury or a disease. An "injury" is the result of trauma, whether great or small, repeated or singular. A "disease," on the other hand, is a non-traumatic harm, which includes those conditions that typically emerge as the result of exposure to environmental hazards or foreign agents.[122] Only after this categorization has been made would we

---

arise out of physical trauma. Justice Lee suggests that my approach entails "two different dividing lines," *infra* ¶ 181 n.8, but in reality, these are just two sides of the same coin. Conditions that are commonly understood as diseases do not arise from physical trauma and often, though not always, involve the etiologies—e.g., foreign agents or inherent defects—that I describe.

[122] Although the term "disease" as used in the ODA would encompass those conditions that emerge both from exposure to environmental factors or foreign agents as well as those that arise as a result of inherent biological or genetic defects, the latter group—inherent defects—is far less likely to be compensable. For example, the various forms of cancer would certainly be categorized as "diseases" because they result not from trauma, but from exposure to environmental hazards or inherent defects. But this classification does not mean that the cancer will ultimately be compensable; the employee must still prove the

(cont.)

look to the questions of compensability—e.g., whether the injury was "by accident"[123] or whether the disease was "medically caused or aggravated by that employment."[124] As discussed above, while these issues of causation define whether an injury is compensable under the WCA or a disease is compensable under the ODA, the primary distinction between the WCA and the ODA is whether the harm at issue is an injury or a disease. Justice Himonas's framework, focusing on the difference between "accidents" and "occupational diseases" as discussed above, conflates these two separate inquiries.

¶ 133   For the reasons discussed above, we should interpret these two statutory schemes such that the WCA remains the default compensation statute, covering all "injuries," including those that emerge over time, and excluding only "diseases"—which are covered by the ODA—as the statute requires. The statutory scheme makes clear that a particular type of harm cannot be both a "disease" and an "injury." Because prior cases interpreting "occupational disease" are no longer relevant, and because previous versions of the ODA no longer define the scope of the current statutory scheme, we should use our traditional method of statutory interpretation and define "disease" in the current version of the ODA using its ordinary meaning. Thus, those conditions that are commonly understood as diseases are the only harms excluded from the WCA and covered by the ODA.[125]

---

necessary causal link between the employment and the disease. Thus, though something like cancer may be considered a disease at the threshold level, it will only be compensated to the extent the employee can show that it resulted from employment, which will be easiest in cases where there is a specific environmental hazard or foreign agent causing the cancer.

[123] UTAH CODE § 34A-2-401(1).

[124] *Id.* § 34A-3-103.

[125] As JBS states in its opening brief, "[t]he current expansive interpretation of the Workers' Compensation Act allows compensation to be paid to workers for *any condition*, no matter how incurred, where the requisite causal connection to the

(cont.)

¶ 134   Now it must be said that this approach may not yield completely satisfying results in every case. But any problematic distinction arises from the legislature's inequitable and unexplained decision to compensate injuries caused by employment more favorably than diseases caused by employment. Any test we could devise would necessarily involve some inequitable distinctions and difficulties in line-drawing. It would certainly seem a better and more rational approach to compensate injuries in the same way as diseases, as many other states have done, but that is a matter for the legislature, not this court. I join Justice Himonas's suggestion that the legislature should revisit these statutes in order to resolve the confusion and inequity inherent in drawing lines between the WCA and ODA.[126] I would note that, because of these inequities, in a borderline case where the harm could reasonably be categorized as either an injury or a disease as those terms are commonly understood, I would favor categorizing the harm as an injury in order to provide the harmed worker the most coverage possible.[127]

---

workplace can be shown." JBS criticizes this approach for "render[ing] inoperative, or at minimum, greatly minimiz[ing] the need for and applicability of the [Occupational Disease] Act." I see it differently. Though I agree that the scope of the WCA is indeed broad, based on its use of the term "injury" to define its scope, because the WCA carves out "diseases" from its definition of injury, there exists a set of harms that are not covered under the WCA, creating a coverage gap for harmed workers. The ODA covers that gap by providing compensation for diseases. And by interpreting the ODA to cover only *diseases*, as I suggest, we avoid expanding the ODA to encroach upon the set of harms already covered by the more worker-friendly WCA.

[126] *Supra* ¶ 43.

[127] When we face a question of whether an employee should receive compensation at all, "any doubt respecting the right to compensation [is resolved] in favor of [the] injured employee." *Salt Lake City Corp. v. Labor Comm'n*, 2007 UT 4, ¶ 16, 153 P.3d 179. The inequity inherent in the interplay of these statutes suggests to me that we should extend this policy to circumstances where

(cont.)

¶ 135 Further, although there may be some initial uncertainty under my approach, over time it will lead to clear categories of "injuries" and "diseases." As cases begin to establish what harms qualify as an injury or disease, both workers and employers will have clear expectations as to what compensation is available.[128] I believe this is a better approach both as a matter of statutory interpretation, as discussed above, and as a matter of efficiency and predictability. It establishes bright-line categories instead of Justice Himonas's multi-factor test, which necessarily requires a case-by-case evaluation.

¶ 136 Justice Himonas expresses doubt over the bright-line nature of my approach,[129] but the experience of other courts reveals that the plain language approach leads to consistent results over time. For example, as discussed above, courts that have adopted a plain language approach have consistently categorized carpal tunnel syndrome as an injury.[130] This suggests

---

there is doubt as to whether a harm is properly understood as a "disease" or an "illness."

[128] Justice Lee agrees with the notion that our decision in this case should be one that furthers clarity and predictability in this historically convoluted area of the law. Yet he argues that the standard I propose is impermissible because it would frustrate "settled reliance interests" in this area. *Infra* ¶ 193. This criticism is at odds with Justice Lee's own recognition that "[t]he law in this area is in disarray and in need of overhaul." *Infra* ¶ 157 n.2. It is inconsistent to recognize in one breath that the legal landscape is a morass and in the next to claim that individuals can somehow develop settled reliance interests despite the shifting sands. Justice Lee's approach is a thoughtful attempt to clarify a very muddled area of the law, but it can hardly be said to be consistent with firm reliance interests, given that he is jettisoning one "element of the legal test" that a line of cases in our precedent has recognized. *See infra* ¶ 203.

[129] *Supra* ¶ 53 n.18.

[130] *E.g.*, *Luttrell*, 507 N.E.2d at 541. *See also Stenrich Grp. v. Jemmott*, 467 S.E.2d 795, 802 (Va. 1996) ("[A]n impairment

(cont.)

that the plain language approach I would adopt does not have the "same fundamental defect" that Justice Himonas's approach retains.[131]

¶ 137   Justice Lee likewise argues that my standard is "fuzzy" and "indeterminate."[132] But as I have noted, my approach will become clearer and more certain as time passes and courts engage in future iterations of the interpretive framework I propose. And even at its starting point, I believe my approach is clearer than the approach Justice Lee advocates. His approach would categorize maladies as being either "injuries by accident" or "occupational diseases" depending on the "unexpectedness" of the malady. His opinion purports to articulate a bright line—a malady is an "injury by accident" if it is either (1) the result of an unexpected causal event, i.e., a mishap, or (2) a condition that is unexpected in that it is not "incident" to the performance of "a given line of work."[133] But to impose such a standard is to simply kick the indeterminacy can down the road.

¶ 138   How will one know whether a given malady is "unexpected," that is, "not incident to," "a given line of work"? Surely experts will be required to opine on the subject. But in addition to the unpredictability caused by the factual disagreements that are sure to arise, Justice Lee's approach also spawns numerous unanswered legal questions. As an initial matter, at what level of generality are we to define the applicable "line of work"? Is "manual laborer" the appropriate way to describe the line of work? Or is "construction worker" more appropriate? Or perhaps, "crane operator." The level of generality at which one defines the relevant field of work is bound to have an outcome-determinative effect on whether a type of harm is "incident" to performance in that field.

---

resulting from cumulative trauma caused by repetitive motion . . . must be classified as an injury, not a disease . . . .").

[131] *Supra* ¶ 53 n.18.

[132] *Infra* ¶ 194.

[133] *Infra* ¶¶ 199–200.

¶ 139 Next, even assuming that we could ascertain the relevant "line of work" with some predictability, it is by no means clear just how common a malady must be to become "incident" to that line of work. At what point does a malady cease to be expected? Does expectedness require that more than 50% of employees in the particular field will suffer the malady in a given year? What if 20% will experience the malady at some point during the entire span of their career?

¶ 140 Justice Lee does not offer any answers to these questions, and it's not clear where courts and litigants should look when attempting to apply his standard. A simple example illustrates the point. Consider a city employee who suffers a burn in the course of rescuing a family from a burning building. The employee might argue that "first responders" is the relevant "line of work," and that it is highly uncommon, and thus unexpected, for first responders to suffer burns on the job. The employer would likely counter that the relevant line of work is firefighter, and that burns are expected in the course of—that is, incident to— working as a firefighter.

¶ 141 Setting this uncertainty aside, we could assume that firefighter is the relevant "line of work." Then we can expect the employer to put on an expert who will testify that no firefighter can reasonably expect to perform the job for a year without suffering at least one burn. Under Justice Lee's approach, there is a strong argument that the employee's burn is an occupational disease because it does not fit into either category of "injury by accident" that Justice Lee recognizes. First, the burn is not a "mishap." The employee deliberately chose to enter the burning building, with full knowledge of the dangers posed. So it cannot be said that the burn was brought about "through carelessness, unawareness," or "ignorance" on the part of the employee.[134]

¶ 142 Under Justice Lee's second category of injury by accident, we would next need to assess whether burns are incident to being a firefighter. But attempting to engage in that analysis reveals yet another level of a complexity—and thus uncertainty—lurking in his approach. It seems that we can't stop

---

[134] *Infra* ¶ 199 n.15.

at asking whether a "burn" is incident to working as a firefighter. Instead, we have to assess whether a burn *of this severity* is incident to working as a firefighter. That is, it may be the case that first-degree burns are a near daily occurrence for all firefighters, but third-degree burns are quite rare. Perhaps the vast majority of all firefighters spend an entire career without suffering a burn of this severity. If that is the case, then, under Justice Lee's approach, the firefighter's first-degree burns are occupational diseases, but the same worker's third-degree burns are injuries by accident. The severity problem seems inextricably bound up in the "expectedness" inquiry—the more severe a harm, the fewer employees in a given field will suffer it—which further suggests that Justice Lee's approach is far from a bright line. And as this hypothetical reveals, Justice Lee's approach would have the troubling effect of converting many conditions that common language usage and common sense suggest should be considered injuries into diseases.[135] Under my approach, this is an easy case.

---

[135] The cases that Justice Lee cites from the "robust body of law" that purportedly supports his approach contain similar failings. *Infra* ¶ 200 n.17. These cases are from jurisdictions that, unlike Utah since 1941, excluded occupational diseases from any form of compensation, and the desire of judges to shoehorn maladies into their states' compensation acts goes a long way toward explaining the lengths to which they have gone to find maladies to be "injuries by accident." *See Indus. Comm'n v. Ule*, 48 P.2d 803, 804 (Colo. 1935) (concluding that the death of a woodworker caused by poisoning from a substance that he worked with routinely was an injury by accident, not an occupational disease); *Downey v. Kansas City Gas Co.*, 92 S.W.2d 580, 582, 587 (Mo. 1936) (concluding that an employee who developed an "infection" ("acute conjunctivitis") in his eye due to repeated, prolonged exposure to harmful substances found in chimney soot "suffered an injury compensable under the Workmen's Compensation Act[,] . . . . not an occupational disease"). In any event, these cases cannot guide our analysis here because they come from jurisdictions operating under entirely different statutory schemes, so they shed little insight into the proper interpretation of Utah's unique statutory history in this field. *Cf. Downey*, 92 S.W.2d at 584–85 ("It will be observed that

(cont.)

A burn, no matter its severity, arises from physical trauma and fits squarely into the category of an injury, which is the more commonsensical and predictable result.

¶ 143   In this case, the harm sustained by Ms. Rueda is a rotator cuff tear. Applying the standard discussed above, this should be categorized at the threshold level as an injury. It is not a disease, because the harm was the result of trauma—repeated stress to her rotator cuff. It did not result from exposure to some environmental hazard or an invasion of a foreign substance into her body. No toxin or germ caused the harm. It was also not the result of inherent biological or genetic defects. Thus, it does not fall within the narrow definition of "disease" discussed above. I would therefore affirm the labor commission's decision to treat Ms. Rueda's harm as an injury and so within the scope of the WCA.

¶ 144   Of course, this threshold level categorization of her harm as an injury does not determine whether Ms. Rueda is ultimately entitled to compensation. It determines only which statutory framework we apply, which in turn sets forth the compensation requirements. Because her harm should be categorized as an injury, the WCA applies, which means that Ms. Rueda must show that her injury was "by accident arising out of and in the course of [her] employment."[136]

¶ 145   The only question in this regard is whether her injury can be considered to be "by accident," as there is no question that it arose out of her employment. In determining whether her injury was "by accident," we must address two issues: whether we should abandon the cumulative trauma theory of accident and

our statute limits the rights created to 'any illness or disease peculiar to the work or process carried on, or which subjects the employee to the danger of illness or process carried on, or which subjects the employee to the danger of illness or disease incident to such work . . . .' 'We are therefore of the opinion that the term "occupational disease" must be restricted to a disease that is not only incident to an occupation, but the natural, usual, and ordinary result thereof . . . .'" (citations omitted)).

[136] UTAH CODE § 34A-2-401(1).

whether the Commission's determination that Ms. Rueda's injury was a cumulative trauma injury was supported by substantial evidence.

¶ 146   As discussed above, the cumulative trauma theory of accident is part of our courts' understanding of the term of art "by accident." It permits the Commission or a court to determine that an injury that emerged over time—as opposed to emerging as the result of a single, discrete incident—may still be considered to be "by accident" as required by the WCA in order to be a compensable injury.[137] This theory has long been part of our interpretation of the phrase "by accident,"[138] has effectively become part of the statute, and I agree with Justice Himonas that

---

[137] *Carling v. Indus. Comm'n*, 399 P.2d 202, 203 (Utah 1965).

[138] I note that because Justice Himonas views the harms covered by the WCA and the ODA as falling along a spectrum of expectedness, definiteness, and time, a harm that emerges over time may be considered the result of cumulative trauma and still be considered an "occupational disease." Under Justice Himonas's view, cumulative trauma appears to simply be the way to describe harms that emerge over time, which harms may be classified as either "injuries by accidents" or "occupational diseases" based on other factors. Under this view, the theory is not limited to the consideration of whether an injury is "by accident." I disagree with this approach both because I believe that the WCA and ODA do not establish a spectrum but rather a bright-line test, as discussed above, and because Justice Himonas's interpretation of the cumulative trauma theory extends it far beyond where we have always understood it in our caselaw—as part of the definition of the phrase "by accident." *See, e.g.*, *Allen*, 729 P.2d at 18 (stating that the term "by accident" is defined as "an unanticipated, unintended occurrence different from what would normally be expected to occur in the usual course of events. . . . [T]his is not necessarily restricted to some single incident which happened suddenly at one particular time and does not preclude the possibility that due to exertion, stress or other repetitive cause, a climax might be reached in such manner as to properly fall within the definition of an accident as just stated above." (alterations in original) (citation omitted)).

there is no good reason to abandon it now.[139] JBS's best argument to do so is that this theory blurs the line between an occupational disease and an injury by accident. Although I agree with JBS that Justice Himonas's retention of the cumulative trauma theory of accident and the common law term of art understanding of occupational disease would lead to confusing and inconsistent results, those results are absent under my approach.[140] So I agree with Justice Himonas that there is no need to overrule our precedent on this issue, though I base my decision on different reasons than those articulated by Justice Himonas.

¶ 147 The final issue related to the compensability of Ms. Rueda's injury is whether the Commission's determination that Ms. Rueda's injury was "by accident" under the cumulative trauma theory of accident is supported by substantial evidence. Justice Himonas has thoroughly addressed this issue in his opinion,[141] and I agree with his conclusion that the Commission's order was supported by substantial evidence. But because of the different approaches Justice Himonas and I propose, our agreement on these issues leads to different results.

¶ 148 Justice Himonas accepts that either an injury by accident or an occupational disease can be caused by cumulative trauma. So his conclusion that the cumulative trauma theory survives and that the Commission's finding of cumulative trauma in this case was supported by substantial evidence leads to the

---

[139] *Supra* ¶¶ 56–67.

[140] Under my approach, the theory does not go to the threshold question of whether a harm is an injury because it only helps to define "by accident," and I would not look to whether a harm is "by accident" to determine whether it falls within the scope of the WCA. Instead, I would employ a bright-line test based on the ordinary meaning of the terms "injury" and "disease." So at least under my approach, there is no confusion created by the retention of the cumulative trauma theory.

[141] *Supra* ¶¶ 68–72.

question of whether Ms. Rueda's injury should be compensated under the WCA or the ODA. He answers this question by concluding that, although her harm was the result of cumulative trauma, it was too gradual to be considered an injury by accident and must be categorized as an occupational disease. I disagree with this approach as I have discussed above. Under my approach, categorization of harms is a threshold matter, and the question of whether the Commission's finding of cumulative trauma was supported by substantial evidence goes only to the secondary issue of compensability. And because I believe that Ms. Rueda's harm should be classified as an injury at the threshold level, and that the Commission's determination that her injury was "by accident" under the cumulative trauma theory was supported by substantial evidence at the compensability level, I would conclude that the Commission was correct to award Ms. Rueda compensation under the WCA.

¶ 149   In conclusion, I believe that Justice Himonas fails to make the proper distinction between the WCA and the ODA and incorrectly relies on the term of art understandings of "by accident" and "occupational disease" to distinguish the two statutes' scopes. This failure leads to his confusing, multi-factor balancing test. I believe the proper approach would be to, as a threshold matter, determine whether the employee's harm qualifies as an injury or a disease. And in my view, the text and history of the statutes require us to employ a plain language approach to interpret these terms. Applying this threshold test to Ms. Rueda's case, I conclude that her harm should be categorized as an injury and so the terms of the WCA should apply. I agree with Justice Himonas that we should not abandon the cumulative trauma theory of accident and that the Commission's order was supported by substantial evidence. I would, therefore, affirm the Commission's decision.

---

ASSOCIATE CHIEF JUSTICE LEE, opinion:

¶ 150   In this case we are asked to delineate the boundary between the Workers Compensation Act (WCA) and the Occupational Disease Act (ODA). That seemingly simple task turns out to be a difficult one, as the governing language of these

two statutes is far from clear, and our cases complicate the matter by our own inconsistencies and imprecisions over the years.

¶ 151  My colleagues have made a valiant attempt to bring order and clarity to this fuzzy field of jurisprudence. I applaud their efforts and find elements of their opinions that I agree with. I agree with Justice Himonas, for example, that the WCA and ODA use words in their legal term-of-art sense, and that the standard we apply here should consider the meaning of those words set forth in the law. Yet I also share Chief Justice Durrant's concerns about the indeterminacy of the "spectrum" envisioned by Justice Himonas's balancing test, and agree with the goal of seeking a bright line in this area.

¶ 152  That leads me back to the drawing board—in search of a test that is consistent with the terms of the statutes and lends itself to consistent application while maintaining some fealty to precedent. With this in mind, I would apply a standard that draws the line between the WCA and the ODA based on whether a given workplace harm is "unexpected." And I would define "unexpectedness" to encompass either an unexpected causal event in the workplace (a "mishap") or an unexpected malady (one that is not an occupational "disease," defined as a malady that is incident to the worker's employment). These alternative notions of unexpectedness are set forth in our cases. And the standard is consistent with the operative language of the two statutory schemes—which treats workplace harms occurring "by accident" as falling under the WCA, Utah Code § 34A-2-401(1), and workplace harms amounting to "occupational disease" as falling under the ODA, *id.* § 34A-3-103.

¶ 153  This approach follows Justice Himonas's standard to some extent. But it defines "accident" purely in terms of "unexpectedness" instead of making that a *factor* to be balanced along with the "definiteness" of the onset of the worker's injury. I acknowledge that our cases have sometimes spoken of the "definiteness" inquiry in the way that Justice Himonas does. But I would reject this "factor" because it finds no basis in the statutory scheme as I understand it and introduces too much

unpredictability into our law. *See infra* ¶¶ 170–72.[1] Thus, I would treat "definiteness" as only circumstantially relevant to the "unexpectedness" of a given causal event—the more definite (not gradual) the onset of a workplace harm the greater the likelihood, all else being equal, that the harm came about as a result of a mishap at work. But I would not consider "definiteness" an element of the test, for reasons set forth long ago by this court. *See Young v. Salt Lake City*, 90 P.2d 174, 176 (Utah 1939) (rejecting definiteness; noting that "to stress the length of time as a basis of determining the accidental nature of the illness is to adopt a rule which may, in many cases, be governed by the bodily resistance of the individual").

¶ 154 The test that I propose would require a remand because the Labor Commission has not had a chance to apply it to the facts of this case. For that reason I dissent from the lead opinion because I disagree with its disposition of the case (affirmance in part and reversal in part) even though I agree with part of the test that it endorses.

¶ 155 I explain the basis for my approach in the paragraphs below. First I explain the grounds for my departure from the approach advanced by Justice Himonas. Then I outline some common ground and also some conflict with the standard proposed by Chief Justice Durrant. Next I offer a more fulsome explanation of the basis for my proposed test. And finally I close by applying my proposed test to the facts of this case.

I

¶ 156 Justice Himonas acknowledges some difficulties in our caselaw in this area. He concedes that our cases "have spoken loosely" in articulating the operative standard—identifying factors of relevance to the distinction between injury by accident and occupational disease (the "unexpectedness of the accident" and the "definiteness as to the occurrence of the injury") but without consistently establishing the precise role these factors play in the analysis. *Supra* ¶¶ 39–40. Thus, Justice Himonas notes

---

[1] My approach is not driven "[p]rimarily" by "policy" concerns. *See supra* ¶ 44. It is rooted in my view of the text of the relevant statutes and our cases.

that our cases have not consistently specified what it is that must be "unexpected" or "definite" to satisfy the legal test, and have also failed to clarify the relationship between these two factors. *See supra* ¶ 39.

¶ 157   Justice Himonas does not ultimately try to defend all of our decisions in this area. Nor does he purport to preserve all articulations of the operative test set forth in each of our prior cases. Instead, he seeks to "clarify" the law by distilling principles that he finds essential.[2] *See supra* ¶ 40. Those principles result in a legal standard that envisions a "spectrum" of workplace injuries rather than a bright line. "[W]hen characterizing an impairment along this spectrum," Justice Himonas proposes to "take into consideration the unexpectedness" of the event giving rise to the worker's injury or illness "as well as the definiteness as to [its] occurrence." *Supra* ¶ 39. Specifically, Justice Himonas proposes to treat unexpectedness as the "primary" factor and definiteness as "secondary." *Supra* ¶¶ 40, 43. As to unexpectedness, Justice Himonas says that we should look to whether "'something . . . broke, or injected itself into, the usual course of the performance of the occupation'" (a "mishap"), *supra* ¶ 41 (quoting *Young*, 90 P.2d at 177), or whether there was "an 'unexpected internal failure of [an employee's] system to function normally," *supra* ¶ 41 (alteration in original) (quoting *Purity Biscuit Co. v. Indus. Comm'n*, 201 P.2d 961, 966 (Utah 1949)). And he says that the definiteness inquiry concerns both the "cause of the injury" and "the resultant injury" itself. *Supra* ¶ 40.

¶ 158 Justice Himonas also acknowledges "criticism regarding the consideration of the definiteness of time as a factor when classifying an injury." *Supra* ¶ 43 (citing 3 Arthur Larson et al., Larson's Workers' Compensation Law § 42.02 (2017));

---

[2] For this reason I do not think any member of the court is in a position to claim to be deciding this case on *stare decisis* grounds. This is the most splintered decision I have seen in my years on this court. But we all agree on one thing: The law in this area is in disarray and in need of overhaul. My overhaul is admittedly more aggressive than Justice Himonas's. But we all are engaged in an exercise of revision and reformulation. None of us is really *clarifying*.

also citing the Chief Justice's critique "that adopting a test that includes definiteness of time as a factor leads to an 'inequitable standard,'" *supra* ¶ 89). Yet he declines to repudiate this element on the ground that it is "entrenched in our case law" as a "secondary factor in determining how to classify workplace harm," with "the primary factor being unexpectedness of cause of the injury or unexpectedness of the resultant injury." *Supra* ¶ 43. And he also stops short of specifying the precise relationship between the "primary" and "secondary" factors—what result is dictated when they point in opposite directions.

¶ 159   For these and other reasons I agree with much of the Chief Justice's critique of Justice Himonas's approach. I am troubled by a test that would "permit the same harm . . . to be categorized as either an injury by accident or an occupational disease in different cases based on hard-to-define factors." *Supra* ¶ 87. And that also seems untenable under the governing statutory scheme. A claim for a harm suffered in the workplace must ultimately be covered by "one or the other"—either WCA or ODA; it "cannot be both." *Supra* ¶ 79.

¶ 160   Unlike Justice Himonas, moreover, I do not find the lead opinion's standard to be dictated by precedent. *See supra* ¶ 47. Nor do I find it impossible to articulate a "clear line between injury by accident and occupational disease." *Supra* ¶ 51. The line that I would draw, as noted above, is one that would treat "unexpectedness" as the line between the WCA and the ODA. That standard, as explained more in Part III below, is a bright line that avoids the difficulties rightly decried by Chief Justice Durrant. And in my view, my approach is not foreclosed by precedent.

¶ 161   The cases cited by Justice Himonas do not ultimately support his assertion that definiteness is embedded in our law. In *Young*, our court held that definiteness was not the "governing factor" for determining whether a malady is an occupational disease. 90 P.2d at 176 ("[I]f the illness is one commonly recognized as incident to the particular occupation, it is an occupational disease. The time taken for the effects of the occupation to become serious is not the governing factor."). And *Young* is particularly powerful precedent on this issue because it presents a close parallel to the question presented here—as to the

boundary between workplace accident and occupational disease,[3] and the role of expectedness and definiteness in that inquiry.

¶ 162   The plaintiff in *Young* was a painter who died of lead poisoning only three weeks after beginning work as a painter. *See id.* at 175–76. Everyone recognized that lead poisoning was an expected disease for painters at the time. But the timing of the plaintiff's demise from such poisoning was extraordinarily quick. *See id.* And that prompted litigation over the question whether the "definite" onset of the plaintiff's condition brought him into the workers compensation statute, or whether the "expected" nature of the lead poisoning condition left him subject to any available tort remedies for occupational disease. The *Young* court took the latter route. And in so doing it unequivocally repudiated the "definiteness" factor (and the notion of a balancing test and the "spectrum" notion that it would lead to).

¶ 163   "From the fact that Mr. Bailey succumbed to the lead poisoning in the vapor in a comparatively short time," the court reasoned that "we should not conclude that the illness was accidental." *Id.* at 176. "Were we to adopt such a rule," the court observed, "the dividing line between an occupational disease and an accident would become extremely hazy as the periods of time for each approached unity." *Id.* This is the central holding of *Young*. It has never been overruled. In my view, it should be followed here.

¶ 164   As Justice Himonas notes, our decision in *Carling v. Industrial Commission*, 399 P.2d 202 (Utah 1965), refers to occupational diseases as "gradually developing conditions." *Id.* at 203. But I view that as merely descriptive dicta—language

---

[3] The question presented in *Young* differed from that presented here only in that at the time of *Young* there was no Occupational Disease Act. In the *Young* era, occupational diseases were the domain of the tort law. So the question presented in *Young* was whether the claimant's injury was covered by workers compensation or instead was subject to tort law. But as explained more below, *see infra* ¶¶ 185–89, the common law notion of occupational disease overlaps substantially with the statutory principle. So *Young* is an important precedent.

describing the typical occupational disease—suggesting only that the timing of onset of an injury may be circumstantially relevant to the key inquiry into expectedness. Nothing in *Carling* overrides *Young*. Nowhere does *Carling* hold that definiteness is an element of the test or "factor" to be balanced on a "spectrum."

¶ 165 The *Carling* opinion is not a model of clarity. But the apparent premise of Carling's case was that he had suffered an "unexpected" accident in the "mishap" sense—that he suffered a sudden loss of hearing as a result of something that went awry in the workplace. *See id.* It appears from the opinion that there was no direct evidence of a workplace mishap. So Carling was left to present circumstantial evidence. That was the evident point of the gradualness evidence that Carling presented. Carling asserted that "after he had been pounding the pipes with [an] air gun for about 20 to 30 minutes, he suddenly became aware that his perception of other noises around him became dulled." *Id.* And he suggested that the sudden timing of his hearing loss indicated that there had been an unexpected event—a mishap—entitling him to workers compensation.

¶ 166 Yet there was contrary evidence in the record. "An acoustical engineer testified that noise from the air gun under the conditions shown was within the limits of tolerance of ordinary ears." *Id.* And Carling's medical records revealed "a long prior history of deficient hearing" documented "as early as 14 years" prior to the alleged incident. *Id.* The medical evidence suggested that circumstances alleged by Carling were "not the usual pattern of a hearing loss suffered in the manner [Carling] contend[ed the] loss occurred." *Id.* The doctors examining Carling's records "were of the opinion that there had been a gradual and continuous regression of his hearing . . . [and] that the type of hearing loss he suffered could be due to a number of factors, including heredity." *Id.*

¶ 167 The commission rejected Carling's theory, concluding that "[t]he medical evidence strongly suggest[ed] occupational disease due to long exposure to loud noise or heredity." *Id.* at 204. And the commission accordingly determined that the record "d[id] not support a finding that the specific incident . . . caused the alleged loss of hearing." *Id.* The holding of *Carling* is an affirmance of that decision. *Carling* never states that definiteness is an element of the test to be balanced with unexpectedness. It

simply refers to evidence of gradual onset in concluding that the commission did not act arbitrarily and capriciously in holding that there was no unexpected event causing Carling's hearing loss. *Id.* at 203–04.

¶ 168   That approach is consistent with the framework that I would apply. The *Carling* opinion makes reference to definiteness and gradualness. But this is dicta describing typical injuries by accident (which usually come on as a result of a definite event) and typical occupational diseases (which usually come on gradually). And the court's dicta referring to this evidence is easily understood as treating definiteness as only of circumstantial relevance.

¶ 169   Indeed the *Carling* opinion affirmatively reaffirms *Young* in an important respect. It does so in its recognition of the cumulative trauma theory—in noting that an accident may arise over time, and need not be the result of a single time-definite incident. *Carling*, 399 P.2d at 203.

¶ 170   This highlights the centrality of the unexpectedness inquiry. A typical accident is one that happens at a distinct, definite time. But the legal test for establishing an accident does not require definiteness. Definiteness is merely descriptive of the typical accident—and thus of circumstantial relevance in a case in which it is unclear whether an accident occurred. Thus, a worker may suffer a series of mishaps over time, and such a series would certainly qualify for workers compensation under *Carling*. *See also Allen v. Indus. Comm'n*, 729 P.2d 15, 18–22 (Utah 1986) (holding that the legal test for an "accident" does not require proof of a definite causal event or mishap so long as the resulting malady is "unexpected").

¶ 171   Justice Himonas cites the Larson treatise as additional authority for his contrary view. *See supra* ¶¶ 35, 39–40 & n.12. But the Larson treatise seems to me to cut against Justice Himonas's approach in a couple of respects. It states that "[t]he basic and indispensable ingredient of 'accident' is unexpectedness." 3 ARTHUR LARSON ET AL., LARSON'S WORKERS' COMPENSATION LAW § 42.02 (2017). And it expressly rejects the use of definiteness as an

element in a statutory scheme, like Utah's, which requires a showing of "injury by accident."[4]

¶ 172 Admittedly, the Larson treatise characterizes definiteness as an element of the test in "the majority of other jurisdictions."[5] Yet the treatise documents a shift in the courts towards minimizing the role of definiteness evidence.[6] To that

---

[4] *See* 3 ARTHUR LARSON ET AL., LARSON'S WORKERS' COMPENSATION LAW § 42.02 (2017) (asserting that where "the phrase 'accidental injury' is used, or the equivalent phrase 'injury by accident,' there is no occasion, as a matter of grammar, to read the phrase as if it referred to '*an* accident' and then proceed to conduct a search for '*the* accident'"); *id.* § 50.01 (asserting that where the statute "speak[s] of 'accidental injury' or 'injury by accident,' the necessity for definite time rests on more questionable grounds"); *see also* UTAH CODE § 34A-2-401(1) (providing compensation for an employee who is "injured" or "killed" "by accident"); *id.* § 34A-2-102(1)(j)(i) (defining "[p]ersonal injury by accident").

[5] *Supra* ¶ 35; 3 ARTHUR LARSON ET AL., LARSON'S WORKERS' COMPENSATION LAW § 42.02 (2017) (acknowledging that definiteness "has been added [as an element] in most jurisdictions").

[6] The jurisdictions that adopted definiteness as an element have also developed a myriad of doctrines and exceptions for satisfying the definiteness requirement in cases involving gradual injuries—greatly diminishing the role of definiteness in establishing injury by accident. *See, e.g.,* 3 ARTHUR LARSON ET AL., LARSON'S WORKERS' COMPENSATION LAW § 50.01 (2017) ("A relatively brief exposure to fumes, dust or cold may lead to protracted period during which the victim gradually succumbs to disease; conversely, months or years of exposure to poisons, jolts or strains may lead to a sudden collapse on a particular day. In either case it is relatively easy to satisfy the definite-time requirement by merely accepting the view that suddenness may be found in either cause or result. When, however, both the cause and effect are gradual, as when protracted exposure leads to protracted deterioration or disease, many courts have still been

(cont.)

extent, the Larson treatise only strengthens my view that definiteness is not an appropriate element of the legal standard. Requiring proof of definiteness is inconsistent with the terms of Utah's WCA and is increasingly out of step with the law of other jurisdictions that once incorporated definiteness as an element.

¶ 173   For these reasons I do not see a basis for establishing definiteness as an element of the test for an injury by accident. And the decision to introduce that element into our law can only bring confusion and indeterminacy into this important field. I turn to that problem now.

II

¶ 174   The Chief Justice, as noted, rightly decries the indeterminacy of the standard proposed by Justice Himonas. He shows how the lead opinion's "construct . . . leads to perplexing results"—with the definiteness factor allowing some claimants to be "compensated at a higher rate than they would be if, like Ms. Rueda, they had soldiered on for two years." *Supra* ¶ 87. And he helpfully highlights the unpredictability of the balancing test implicated by the "hard-to-define factors" put forward by Justice Himonas. *Supra* ¶ 87.

¶ 175   For these reasons I agree that the "spectrum" envisioned by the lead opinion's balancing test is untenable. Our cases may not always have drawn a clear line between these two statutory schemes. But the legislature clearly envisions such a line. A given claim for harm suffered in the workplace cannot be susceptible to categorization under both statutory schemes. The legislature has expressly stated as much in both the WCA and the ODA. *See* UTAH CODE § 34A-2-102(1)(j)(ii) (workers compensation claims do not extend to an occupational "disease"); *id*. § 34A-3-111 (ODA compensation is not "payable" if "compensation is payable" under the WCA). We must accordingly police that line; we override the terms of the operative statutes if we condone a balancing test that allows the same workplace harm to be covered under either the WCA or the ODA.

---

able to find 'accident' by treating each impact or inhalation as a miniature accident in itself, leading ultimately to disability.").

A

¶ 176   That said, I cannot agree with the standard proposed by the Chief Justice. In my view, the WCA and the ODA do not use the terms "injury" and "disease" in their "ordinary" sense. Like Justice Himonas, I understand the legislature to have embraced the legal term-of-art understanding of "injury by accident" and "occupational disease" as the dividing line between the WCA and the ODA.

¶ 177   The Chief Justice acknowledges that the terms "injury," "disease," and "illness" may each be defined in a manner that encompasses a wide range of maladies or harms. *Supra* ¶ 129. But he rejects that reading because he views it as creating an impermissible overlap between the WCA and the ODA. And he cites that overlap as a basis for adopting a narrower sense of "disease." *Supra* ¶ 130.

¶ 178   I see a simpler way out of the thicket. The overlap problem can easily be resolved by reference to the term-of-art understanding of "injury by accident" and "occupational disease." If the legislature was thinking of that understanding of these terms—and I see no reason to conclude otherwise—then it would make perfect sense to give the terms "injury," "disease," and "illness" a broad meaning encompassing all forms of workplace harm.

¶ 179   For that reason I see no basis in the operative statutes to require a narrow construction of "disease" or "illness." If anything the ODA seems to direct us to a broad reading. It speaks of "any disease or illness." *See* UTAH CODE § 34A-3-103. The "any" modifier seems to suggest a broad understanding. And the alternative "disease *or illness*" formulation reinforces that understanding.

¶ 180   The Chief Justice finds no "relevant distinction between 'disease' and 'illness.'" *Supra* ¶ 98 n.44. But at least one of the cases he cites in support of his approach finds an important distinction. *Luttrell v. Industrial Commission*, 507 N.E.2d 533 (Ill. App. Ct. 1987), notes that "illness" is among the terms the legislature "could have used to better convey" an intention to "provide compensation for any malady" under Illinois's Occupational Disease Act. *Id.* at 541. That highlights a significant strike against the Chief's reading of our statute. The Utah ODA

covers "any disease or illness." And under the canon of independent meaning we should presume that "illness" adds something. *See, e.g.*, *Lancer Ins. Co. v. Lake Shore Motor Coach Lines, Inc.*, 2017 UT 8, ¶ 13, 391 P.3d 218. That canon suggests a basis for finding a broad meaning of "illness" even if we adopt a narrow understanding of "disease." And the broad notion of "illness," as the *Luttrell* court concludes, is easily sufficient to cover "any malady." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1127 (2002) (defining "illness" as "an unhealthy condition of body or mind: MALADY").[7]

---

[7] The Chief Justice responds by asserting that a decision to give independent meaning to "illness" is inconsistent with the "statutory scheme" because "it threatens to permit the same type of harm to fall within the purview of both the WCA and the ODA." *Supra* ¶ 98 n.44. But that response is circular. My approach does not create overlap between the statutory schemes; it merely divides the two acts on a ground that turns on the mechanism of causation—not the nature of the harm. *See infra* ¶ 184. The Chief Justice presumes that the legislature divided the acts into categories of harm. But that construct fails because it is inconsistent with the text and structure of the statute and the canon of independent meaning. *See supra* ¶¶ 178–183.

The Chief Justice also criticizes my approach as creating an inequity. He notes that two employees who experience the same workplace harm via distinct causal mechanisms would be compensated differently under my framework. *Supra* ¶ 98 n.44. But I see no inequity. I see good reasons for compensating the same malady differently depending on the mechanism of causation. In the Chief Justice's example, an employee called upon to work with lead paint on a daily basis is likely receiving higher compensation in the form of hazard pay because of the known risks associated with that employment. By contrast, an office worker is not ordinarily presented with the risks of lead poisoning, so an employee in this field is likely compensated in accordance with the low risks associated with office employment. In any event, our interpretation of statutory language does not turn on our own sense of equity. We should give effect to the legislative judgments expressed in the statute's text.

¶ 181 The Chief Justice's approach would make trauma-based maladies the exclusive domain of the WCA, *see supra* ¶¶ 129, 132, with the ODA left to cover only maladies arising out of exposure to "bacteria, virus, poison, toxin, or germs," *supra* ¶ 127. But these premises seem incompatible with the terms and structure of these statutes. The ODA's exclusive remedy provision speaks of "compensation under this chapter for diseases *or injuries to health* sustained by a Utah employee." UTAH CODE § 34A-3-102(3) (emphasis added). And elsewhere the ODA provides for compensation for "[p]hysical, mental, or emotional diseases *related to mental stress* arising out of and in the course of employment." *Id.* § 34A-3-106(1) (emphasis added).[8] These provisions seem to me to make it impossible to limit the ODA to maladies arising from exposure to microbes or toxins. Clearly the statute encompasses other "injuries to health," including at a minimum those arising from "mental stress."

¶ 182 I likewise find no basis for treating "injury" as limited to harms arising from physical trauma. The ordinary sense of "injury" does not contemplate such a limit. *See supra* ¶ 129 n.116 (listing definitions of "injury" as comprising "harm" or "damage"); *supra* ¶ 130 (conceding that "the definition of 'injury' is broad, with no narrower understanding of the term than

---

[8] The Chief Justice claims that mental- or emotional–stress-related maladies fall within his definition of disease because they do not result from physical trauma. *See supra* ¶ 130 n.121. But this makes the Chief's standard even murkier. Do we evaluate whether a harm is a disease as ordinarily defined to determine whether it is compensable under the ODA? *See supra* ¶ 130 (defining a disease as a malady resulting from "exposure to environmental hazards and foreign agents, such as bacteria, viruses, other germs, poisons, and toxins, or from inherent biological or genetic defects"). Or do we look exclusively to whether a malady results from physical trauma? *See supra* ¶ 130 n.121. These are two different dividing lines. I am unsure which one the Chief Justice proposes to adopt. In any case, I see nothing in the statute's text that indicates that either the ordinary definition of trauma or disease divide the boundaries of the ODA and WCA.

'damage or harm'"). And our longstanding precedent likewise contradicts it. *See, e.g.*, *Allen*, 729 P.2d at 18 n.3 (identifying an "internal failure" as compensable under the WCA); *Tintic Milling Co. v. Indus. Comm'n*, 206 P. 278, 281–83 (Utah 1922) (concluding that a malady resulting from exposure to fumes was compensable under the WCA).

¶ 183    I would reject the trauma-based conception of "injury" on the above grounds. If the ordinary *and* term-of-art understanding of "injury" are broad, we should not limit the term by judicial fiat. We should respect the settled understanding of the statutory language, which has remained intact (unamended) since the statute's first enactment in 1917. *Compare* 1917 Utah Laws 322, *with* UTAH CODE § 34A-2-102(1)(j). Surely the settled understanding of "injury" has sustained important reliance interests over the years. And in my view those interests are more weighty than the contrary standards embraced in caselaw in other jurisdictions.

B

¶ 184    The difference between the WCA and the ODA has long been understood to turn on the mechanism of causation and not on the nature of the harm to the worker. Specifically, our law has long deemed the line between the WCA and ODA to turn on whether the worker's malady resulted "by accident" (triggering the WCA) or is instead an "occupational disease" (triggering the ODA).

¶ 185    Significantly, as Justice Himonas notes, our cases have "consistently referred to 'injury by accident' as a cohesive phrase." *Supra* ¶ 50. Our law has never extracted the term "injury" out of this legal phrase, or deemed the injury/disease distinction to be controlling. For that reason it seems perilous to do so here. The law has long treated legal words transplanted from legal fields to bring their "soil" with them. *See, e.g.*, *Nielsen v. State*, 2016 UT 52, ¶ 18, 391 P.3d 166; *State v. Canton*, 2013 UT 44, ¶ 28, 308 P.3d 517; *Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647. It upsets important reliance interests to ignore that soil and to parse legal language in a manner crediting "ordinary" or "plain" meaning of statutory terms.

¶ 186    The Chief Justice claims to find support for his approach in the 1991 amendments to the ODA. Because the 1991

amendments define "occupational disease" as "any disease or illness that arises out of and in the course of employment and is medically caused or aggravated by that employment," UTAH CODE § 34A-3-103, and "jettison[] . . . previous statutory definitions of 'occupational disease,'" the Chief Justice concludes that "the legislature has rejected the . . . term of art understanding of 'occupational disease.'" *Supra* ¶ 99. In other words, Chief Justice Durrant concludes that the 1991 amendments provide that "occupational disease" means simply "any disease." *Supra* ¶ 99. And he therefore asserts that "'any disease[]' . . . should be interpreted according to its plain meaning." *Supra* ¶ 99.

¶ 187   I disagree. The cited provision of the 1991 amendments does not provide a definition of "occupational disease"; it defines "*compensable* occupational disease." UTAH CODE § 34A-3-103 (emphasis added). That strikes me as significant. The point of section 103, as I see it, is not to define the scope of "occupational disease" but to articulate a causation standard—to require that the disease or illness arise out of employment and be medically caused thereby. The operative terms of section 103 bear that out. They do not define or restrict "occupational disease" in any way; by articulating a causation standard they simply define which occupational diseases are "compensable."

¶ 188   To the extent section 103 defines "occupational disease" it does so in terms that are circular—that define occupational *disease* as "any disease." And "circular terminology" in a "statutory definition[] drives home a key to its meaning." *Hughes Gen. Contractors, Inc. v. Utah Labor Comm'n*, 2014 UT 3, ¶ 14, 322 P.3d 712. It emphasizes that the legislature is "convey[ing] its acceptance of a term of art with a widely shared meaning." *Id.*

¶ 189   It is true, as the Chief Justice observes, that the 1991 legislature failed to preserve longstanding statutory definitions of "occupational disease." *Supra* ¶ 99. But I do not see how we can conclude that this was an intentional "jettison[ing]" of the legal term-of-art understanding of this phrase. The notion of occupational disease is deeply embedded in our law. The term has common law roots, tracing back to our decision in *Young v. Salt Lake City*, 90 P.2d 174 (Utah 1939). *Young* defined occupational disease as a malady "commonly recognized as incident to the usual performance of [an] occupation." *Id.* at 177. That notion of

occupational disease was also carried forward by statute for many decades. Although for a time covered occupational diseases included only those expressly set forth by statute,[9] our law has also long required proof that a given malady is one that "can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment." 1941 Utah Laws 83; *see also id.* at 97 (requiring, among other elements, proof that "the disease or injury to health can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the employment").

¶ 190    This was the state of the law of occupational diseases when the legislature enacted the 1991 amendments to the ODA. In both the common law and by statute our law had always deemed "occupational disease" to refer to conditions that are understood to be a "natural incident" to a given line of work. That principle remained unaltered for many decades. And the legislature enacted the 1991 amendments against that backdrop.

¶ 191    For these reasons I would interpret the legislature's circular reference to "compensable occupational disease" as encompassing "any disease or illness" that arises out of employment and is medically caused thereby as an acceptance of the longstanding legal notion of "occupational disease." The legislature apparently thought it didn't need a more precise definition because this principle was so deeply embedded in our law.[10]

---

[9] *See* 1941 Utah Laws 83 (stating that "[f]or purposes of this act only the diseases enumerated in this section shall be deemed to be occupational diseases" and setting forth a list of twenty-seven conditions covered by the statute). This provision was amended in 1949 to include "other diseases" meeting a series of criteria. S*ee id.* at 97–98.

[10] I concede that the 1941 ODA departed from the common law definition of occupational disease by identifying a limited number of compensable maladies. *See supra* ¶ 118 & n.95. But I see no basis for the conclusion that the 1941 amendments "reject[ed]" those aspects of the standard, first articulated in *Young*, that seem inherent in the statute's circular definition of occupational disease.

(cont.)

¶ 192 *Young* has never been overruled. And "[t]he age-old principle is that words undefined in a statute are to be interpreted and applied according to their common-law meanings."[11] I would follow that "age-old principle" here. I would conclude that the legislature embraced the *Young* notion of "occupational disease," and did not intend to "jettison" it in the circular reference in section 103.

¶ 193 Chief Justice Durrant's contrary conclusion threatens to undermine settled reliance interests in this field.[12] Thus, the Chief Justice's proposed standard is a linguistically permissible one. We can speak of "injury" and "illness" in the way that he

---

*Supra* ¶ 102 n.57; *see supra* ¶ 107 n.68. The Chief Justice fails to respond to the argument that my standard is entirely consistent with the text of the 1941 and 1949 versions of the ODA. *See supra* ¶ 189.

[11] *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 320 (2012); *see also Neder v. United States*, 527 U.S. 1, 23 (1999) (applying this "age-old" principle to the meaning of "defraud"; stating that "under the rule that Congress intends to incorporate the well-settled meaning of the common-law terms it uses, we cannot infer from the absence of an express reference to materiality that Congress intended to drop that element from the fraud statutes"); *Gilbert v. United States*, 370 U.S. 650, 655 (1962) ("[I]t is important to inquire . . . into the common-law meaning of forgery at the time the 1823 statutes was enacted. For in the absence of anything to the contrary it is fair to assume that Congress used that word in the statute in its common-law sense.").

[12] Elsewhere, as the Chief Justice notes, I lament the state of disarray in our law in this field. *See supra* ¶ 135 n.128 (citing *supra* ¶ 157 n.2). But that does not mean that there are no settled points of law in this area, or that reliance interests are entirely irrelevant. Certainly our cases have vacillated on the proper standard for distinguishing "injury by accident" and "occupational disease." Yet one point has long been clear: These are legal terms of art. And the Chief Justice's approach would introduce an entirely new regime for dividing cases between the ODA and the WCA.

proposes. Yet I doubt that any litigant or lawyer in this field would have anticipated the standard proposed in his opinion. It is more likely that the 1991 amendments have been understood as continuing the longstanding legal term-of-art notion of "occupational disease."

C

¶ 194   The Chief Justice's proposed standard also seems to me to be vulnerable to the same charge he (rightly) levels at Justice Himonas's approach—that it is too fuzzy and indeterminate to yield predictable results. Even a "narrow" notion of "disease" will require difficult line-drawing. We can accept that "disease" cannot mean any "injury." But we still have to decide what conception of "disease" to adopt. And the choice among various "narrow" notions of disease seems arbitrary (and not dictated by anything that is apparent in "plain" meaning).

¶ 195   Even after selecting a particular definition of disease, many ailments will be difficult to categorize. First, our cases have consistently had to deal with a class of maladies referred to as "internal failure[s]." *Allen*, 729 P.2d at 18 n.3. These conditions typically involve "general organ or structural failure" and include "heart attacks, hernias, and back injuries." *Id.* The *internal* nature of these conditions will likely make it difficult to place them into either the "physical trauma" or "exposure" category.[13]

¶ 196   Second, the WCA's exclusion of occupational disease is subject to an exception. The WCA covers diseases when "the disease results from the injury." UTAH CODE § 34A-2-102(1)(j)(ii). Over seventy years ago, our court interpreted the term "disease" in this exclusion to mean "occupational disease." *See Andreason v. Indus. Comm'n*, 100 P.2d 202, 205–06 (Utah 1940). The court's interpretation was based, in part, on the fact that an alternative holding would inject both fuzziness and arbitrariness into the law.

---

[13] The Chief Justice states that these types of maladies would fall under his definition of injury "if they result from identifiable physical trauma acting upon the body." *Supra* ¶ 129 n.118. But again the Chief provides no standard for determining what counts as "trauma." And that is what leaves this category of cases in doubt.

Specifically, this reading would make "compensation [under the WCA] dependable upon the practically impossible task of proving which of two possible avenues of entry was used by the germs." *Id.* If the contagion entered the body through a cut or other injury due to physical trauma, then it would be compensable under the WCA. *See id.* But if the bacteria entered the system through some other means of exposure—dissociated from a physical trauma— then the disease would be compensable as an occupational disease. *Cf. id.* This concern is no less significant today, and no less problematic under the Chief Justice's formulation.

¶ 197   If the legislature unambiguously directed us to use the ordinary meaning of injury and disease to divide harm between the WCA and the ODA, then the fuzziness and arbitrariness associated with the Chief Justice's approach would not be reasons to second-guess that standard. But the better view is that the ODA directs us to fall back on the longstanding legal term-of-art meaning of "occupational disease"—to harms or maladies that are understood as "inherent" in a given line of work. Perhaps the statute is not as clear as it might be in directing us to that definition. But that definition seems dictated by longstanding canons of construction. And adopting it furthers the goal of policing a clear line between the WCA and the ODA.

III

¶ 198   The operative statutory terms in my view go to the mechanism of causation of a given workplace harm. If a worker's malady results "by accident," it is covered by the WCA. If it is an "occupational disease," it is covered by the ODA. These are two pieces of a puzzle in this field. We can understand the coverage of the WCA only if we also understand the coverage of the ODA. Our precedents have not always considered both pieces of the puzzle in their analysis; and that is part of the reason we are left with such a difficult question in this seemingly simple case.[14]

---

[14] The most egregious example is *Specialty Cabinet Co., Inc. v. Montoya*, 734 P.2d 437 (Utah 1986). In that case, we expressly declined to examine "whether the injuries of [the plaintiffs] satisf[ied] the definition of 'occupational disease' under [the ODA]" because we had already concluded that the maladies fell

(cont.)

¶ 199 The legal test for differentiating "injury" and "occupational disease" is "unexpectedness." There are two notions of unexpectedness—one going to the incident that caused the worker's malady and the other going to the malady itself. And these two notions of unexpectedness follow from two alternative senses of "by accident." Sometimes we use "accident" to refer to a "mishap."[15] When workplace harm results from a mishap we can say it happened "by accident," and thus is covered by the WCA.

¶ 200 The other notion of "accident" is "by chance."[16] This is where the ODA notion of "occupational disease" comes into play. *Cf. Young*, 90 P.2d at 177 (outlining a framework for dividing workplace harm between injury by accident and occupational disease similar to the one I propose). Some maladies are "expected" in a given line of work in the legal term-of-art sense of "occupational disease"—they are understood to be "incident to" a

---

within our cases' broad understanding of injury by accident. *Id.* at 440. In my view, the two issues cannot be interpreted in isolation—in every case the ODA and the WCA need to be assessed in relation to each other.

[15] *See, e.g.*, *Tintic*, 206 P. at 280 (identifying one relevant sense of accident as an "unlooked for mishap, or an untoward event, which is not expected or designed by the workman himself" (citation omitted)); *Allen*, 729 P.2d at 17–22 (identifying an "unusual event" as one way, but not the only way of proving injury by accident); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 11 (2002) (defining "accident" as "2a usu. sudden event or change occurring without intent or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result").

[16] *Andreason*, 100 P.2d at 205–06 (noting that "Webster defines 'accidental' as 'happening by chance, or unexpectedly', and 'accident' as an unexpected event" and holding that the WCA's coverage extends to an employee's contraction of a rare disease during the course of his employment); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 11 (2002) (defining "accident" as "1a: an event or condition occurring by chance or arising from unknown or remote causes").

given line of work. *Id.* If a malady is expected in an employee's line of work, it cannot be said to have occurred "by chance." And that malady would be compensable only under the ODA. *See id.* Alternatively, if a malady results from the usual course of the employment, *i.e.* without the occurrence of a mishap, but it is not within the class of maladies that are "incident to" the employee's line of work then it has occurred "by chance" and would be compensable under the WCA.[17] *See id.*

¶ 201   I would treat either of these notions of accident as sufficient to trigger coverage under the WCA. And I would not treat "definiteness" as an element of the legal test. The timeframe of onset of a given malady has no direct bearing on whether it came about "by accident" or was instead "incident to" a given line of work. *See id.* at 176–77. And adding that "factor" to the legal framework raises all sorts of complications that the lead opinion declines to answer—as to the interplay between the two factors, and what to do if they point in opposite directions. *See id.*

---

[17] The Chief Justice criticizes my proposed standard as introducing similar fuzziness. He chides me for not clearly establishing a basis for determining whether a given malady was incident to an employee's employment. *See supra* ¶¶ 137–41. But the difference between my test and the Chief Justice's is that mine taps into well-established legal terms of art. And there exists a robust body of law—in cases from other jurisdictions and treatises—applying these terms in a manner consistent with my opinion. *See, e.g.*, *Indus. Comm'n of Colo. v. Ule*, 48 P.2d 803, 804 (Colo. 1935) (applying an "incident to his employment" standard for occupational disease); *Downey v. Kansas City Gas Co.*, 92 S.W.2d 580, 584 (Mo. 1936) (applying an "incident to" employment standard to define occupational disease); *In re Mack v. Rockland Cty.*, 128 A.D.2d 922, 922 (N.Y. App. Div. 1987) (applying an "incident to" employment standard for occupational disease); *see also* 4 ARTHUR LARSON ET AL., LARSON'S WORKERS' COMPENSATION LAW § 52 (2017) ("Jurisdictions having general coverage of occupational disease now usually define the term to include any disease arising out of exposure to harmful conditions of the employment, when those conditions are present in a peculiar or increased degree by comparison with employment generally.").

(warning of this precise problem over seventy years ago). That is the trouble with multi-factored balancing tests. They enhance flexibility but at the expense of determinacy. I think our law in this field needs determinacy. And I find no mandate in the statute or in our cases for the indeterminacy (flexibility) of a balancing test.

¶ 202   This is not to say that "definiteness" (or its converse, "gradualness") should be entirely irrelevant. In close cases where it is unclear whether there was a mishap, it seems to me that the definiteness of the onset of an injury could be circumstantially relevant. All else being equal, a distinct onset of an injury would suggest that something went wrong at work—that the worker was not just doing his job as required by his employer.[18] Conversely, a gradual onset could suggest—again, all else equal—that there may not have been a mishap but instead that the injury or illness came about as a result of the worker doing his job.[19]

¶ 203 My standard admittedly rejects the "definiteness" inquiry as an independent element of the legal test. But I am not repudiating the inquiry entirely; I am treating "definiteness" as circumstantial evidence, with "unexpectedness" as the core test. Our cases since *Young*, moreover, have never been clear on the role of "definiteness" in the inquiry. When we have referred to

---

[18] *See Tintic*, 206 P. at 282 (quoting authority from Indiana discussing the circumstantial relevance of acute onset of symptoms as evidence that the employee was exposed to an unusual risk or a mishap).

[19] *See supra* ¶¶ 164–69 (discussing the circumstantial role of gradualness evidence in the *Carling* case). This latter point is not inevitable, however. Certainly there could be a series of mishaps—slips and falls, for example—that over time could result in harm. *See Carling*, 399 P.2d at 203 (recognizing the cumulative trauma theory). And when that happens, it would be apparent that the worker is entitled to workers compensation, since an injury by a series of accidents is still an injury by accident. This underscores the point that gradualness is not the test, or even a factor to be balanced. It is at most a circumstantial indicator (in close cases where unexpectedness is in doubt) of unexpectedness.

occupational diseases as gradually developing, moreover, we have done so in cases in which the ODA question was not before us—in cases in which we were asking only about WCA coverage. *See supra* ¶¶ 164–71. And our recognition of the cumulative trauma theory of injury by accident further bolsters the conclusion that definiteness is not a governing factor. *See supra* ¶¶ 164–71.

¶ 204   Under my approach, cumulative trauma will continue to function as it has in the past. It is a theory for explaining how a given malady, not traceable to a single workplace event or strain, may constitute an injury compensable under the WCA. *See Carling*, 399 P.2d at 203. But in such cases, the claimant must still show that the malady was "unexpected" in the sense set forth above. *See id.* (noting that even in cases asserting cumulative trauma a plaintiff must still show that the malady is not an occupational disease).

IV

¶ 205   The WCA and the ODA are two pieces of a puzzle. We cannot define the scope of the WCA without accounting for the terms of the ODA, and we cannot define the ODA's reach without accounting for the WCA. Thus, to be covered by the WCA a given workplace harm must arise out of an "accident" in the course of employment and *not* constitute an "occupational disease" covered by the ODA. The terms "accident" and "disease" are the operative terms. And they should be defined in accordance with the meaning they have been given in the law—a meaning that dovetails with the "unexpectedness" factor identified in our caselaw, encompassing both an unexpected causal event (a "mishap") and an unexpected harm (*not* an "occupational disease").

¶ 206   Our cases have long ignored the ODA piece of the puzzle. I would repudiate the strands of analysis in our cases that do so. I would reformulate the legal standard in terms set forth in this opinion.

¶ 207   And I would decide this case under this test. First I would conclude that there was no evidence of a mishap in Ms. Rueda's work for JBS USA. For reasons set forth in Justice Himonas's opinion I would hold that there is no basis in the record for concluding that the harm suffered by Ms. Rueda came about as a result of anything other than her simply doing her job

over time. And for that reason I would hold that her malady did not come about "by accident" in the first sense of the causal event being "unexpected."

¶ 208 That leaves the question of the second sense of unexpectedness — whether Ms. Rueda's shoulder condition itself is "unexpected," or in other words *not* an "occupational disease." I would examine this question under the standard from *Young*, which goes to whether Ms. Rueda's shoulder condition is one that is "commonly recognized as incident to the usual performance of [her] occupation." *Young*, 90 P.2d at 177.

¶ 209 This is the point on which I deem a remand necessary. The Labor Commission did not consider this question. That is understandable given that our cases have not clearly formulated the test in the manner in which I would apply it. Having now clarified the test, I would remand the case to allow the Labor Commission to consider this question in the first instance, upon briefing, evidence, and argument submitted by the parties.

———————————